JONATHAN M. HOUGHTON, N.J. Bar No. 369652021
JACK E. BROWN, Virginia Bar No. 94680*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
JHoughton@pacificlegal.org
JBrown@pacificlegal.org

CALEB R. TROTTER, Cal. Bar No. 305195*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
CTrotter@pacificlegal.org

* *Pro Hac Vice Motions Forthcoming*

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Shannon MacDonald, M.D.; Paul Gardner, M.D.; J.A., a minor, by and through guardian and next friend Michael Abell; Michael Abell; and Hank Jennings,<br><br>Plaintiffs,<br><br>v.<br><br>Otto F. Sabando, in his official capacity as President of the New Jersey State Board of Medical Examiners,<br><br>Defendant. | No._____<br><br>**Complaint for Declaratory and Injunctive Relief** |

1

Plaintiffs Shannon MacDonald, M.D. (1 Franklin St. #5404, Boston, MA 02110)), Paul Gardner, M.D. (416 Denniston St., Pittsburgh, PA 15206), J.A., a minor, by Plaintiff Michael Abell the father, legal guardian, and next friend of J.A. (102 Buckingham Rd., Montclair, NJ 07043), and Hank Jennings (75 Prospect Terr., Tenafly, NJ 07670) by their attorney, Jonathan Houghton (3100 Clarendon Blvd., Suite 1000, Arlington, VA 22201) of the Pacific Legal Foundation, allege the following:

## INTRODUCTION

1. Plaintiff J.A. was 18 months old when he was diagnosed with pineoblastoma, a rare and aggressive brain tumor. Seeking the best possible care, J.A.'s father contacted every pediatric oncologist in the country he could find, with the family ultimately deciding to undergo treatment at their then-home hospital in New York. After multiple rounds of chemotherapy and two surgeries, it became clear that J.A. needed a different treatment plan. His doctors referred him to Dr. MacDonald because of her nationally recognized expertise in proton therapy, a specialized radiation treatment not then available in New

York. After remotely discussing options with Dr. MacDonald—who was also able to remotely review J.A.'s scans—J.A.'s family decided to undergo treatment with Dr. MacDonald in Boston.

2.     That decision was lifesaving. J.A. is now years removed from his successful treatment. However, J.A. must continue to have scans performed once a year for the rest of his life to monitor for his cancer's return.

3.     Without telemedicine, patients suffering from rare cancers and diseases like J.A. must either forego lifesaving treatment or suffer by traveling out of state every time an appointment with a national specialist like Dr. MacDonald is needed. Many cannot bear the burdens of frequent travel. Telemedicine allows patients and their families, especially in situations where time is of the essence, to consult quickly and affordably with these unique specialists around the country. Telemedicine also allows patients and their families to easily check-in with their specialists following treatment to discuss progress and concerns. New Jersey law, however, makes those remote consultations and check-ins illegal unless the out-of-state physician-specialist first obtains a New Jersey medical license.

4.      Under the United States Constitution's Dormant Commerce Clause and Privileges and Immunities Clause, the government cannot erect such high barriers to the interstate practice of specialized medicine without significant local benefits. Further, the First Amendment to the U.S. Constitution prohibits the government from restricting conversations between patients and their physician-specialists based on the content of those discussions. And the Fourteenth Amendment's Due Process Clause does not permit the government to restrict the ability of parents to direct the medical care of their children. Plaintiffs, who are New Jersey citizens and out-of-state specialists with patients in New Jersey, seek to vindicate their constitutional rights—and ensure they can continue to provide and receive—lifesaving care.

## JURISDICTION AND VENUE

5.      This action arises under the Dormant Commerce Clause of Article I, § 8, cl. 3 of the United States Constitution, the Privileges and Immunities Clause of Article IV, § 2, cl. 1 of the Constitution, the First and Fourteenth Amendments to the Constitution, and 42 U.S.C. § 1983. This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331 (federal question) and 1343(a) (redress for deprivation of civil rights).

4

Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

6.  Venue in the District of New Jersey is proper because the Defendant resides in New Jersey and a substantial part of the events giving rise to the claims occurred in New Jersey. 28 U.S.C. § 1391(b)(1)–(2).

## PARTIES

7.  Plaintiff Shannon MacDonald, M.D., is a United States citizen and resident of Massachusetts. Dr. MacDonald is a highly regarded and widely published board-certified radiation oncologist at Massachusetts General Hospital in Boston. She is also credentialed to see patients at Boston Children's Hospital and Dana Farber Cancer Institute. With a practice specializing in rare pediatric cancers and the use of proton therapy—a highly specialized therapy not widely available in the United States—Dr. MacDonald sees patients from around the world.

8.  Plaintiff Paul Gardner, M.D., is a United States citizen and resident of Pennsylvania. Dr. Gardner is board-certified in Neurosurgery and is the neurosurgical director of the Center for Cranial Base Surgery at the University of Pittsburgh Medical Center. An expert in skull base

surgery, Dr. Gardner helped develop endoscopic endonasal surgery. He has authored many peer-reviewed articles, and he co-authored the book *Skull Base Surgery*, which offers instruction on more than 45 skull base procedures. Due to Dr. Gardner's expertise, he is sought by patients from across the United States.

9.     Plaintiff J.A. is a minor, a United States citizen, and resident of Essex County, New Jersey. J.A. is a patient of Dr. MacDonald.

10.     Plaintiff Michael Abell is a United States citizen and resident of Essex County, New Jersey. He is also Plaintiff J.A.'s father, legal guardian, and next friend.

11.     Plaintiff Hank Jennings is a United States citizen and resident of Bergen County, New Jersey.

12.     Defendant Otto F. Sabando, is the President of the New Jersey State Board of Medical Examiners, which is responsible for regulating and licensing the practice of medicine in New Jersey. *See* N.J. Stat. §§ 45:9-1, *et seq.*, 45:1-61–1-66. Mr. Sabando is sued in his official capacity.

6

## FACTUAL ALLEGATIONS

### New Jersey's Telemedicine Licensure Rule[1]

13.    New Jersey law mandates that "any health care provider who uses telemedicine or engages in telehealth while providing health care services to a patient [in New Jersey] shall" be licensed as a health care provider in New Jersey. N.J. Stat. § 45:1-62(b); *see also* N.J. Admin. Code § 13:35-6B.5(a).

14.    "Telemedicine" is defined as "the delivery of a health care service using electronic communications, information technology, or other electronic or technological means to bridge the gap between a health care provider who is located at a distant site and a patient who is located at an originating site, either with or without the assistance of an intervening health care provider." N.J. Stat. § 45:1-61; N.J. Admin. Code § 13:35-6B.2.

15.    "Telemedicine" does not "include the use, in isolation, of electronic mail, instant messaging, phone text, or facsimile transmission." N.J. Stat. § 45:1-61; N.J. Admin. Code § 13:35-6B.2.

---

[1] Unless otherwise specified, the Complaint uses "telemedicine" to refer to both telemedicine and telehealth.

16.     New Jersey law is ambiguous as to whether an "audio-only telephone conversation" is considered "telemedicine." *Compare* N.J. Admin. Code § 13:35-6B.2 (exempting audio-only telephone conversations), *with* N.J. Stat. § 45:1-61 (as amended by L. 2021, c. 310, § 3) (removing exemption of audio-only telephone calls).

17.     "Telehealth" is defined as "the use of information and communications technologies, including telephones, remote patient monitoring devices, or other electronic means, to support clinical health care, provider consultation, patient and professional health-related education, public health, health administration, and other services." N.J. Stat. § 45:1-61.

18.     Should a physician use telemedicine or telehealth while caring for a patient in New Jersey without holding an active New Jersey medical license, she or he is guilty of a "crime of the third degree," N.J. Stat. § 2C:21-20, punishable by 3–5 years imprisonment and a fine up to $15,000, §§ 2C:43-3, 6. Unlicensed telemedicine and telehealth in New Jersey carries a civil penalty of $10,000 for a first offense and $20,000 for subsequent offenses. N.J. Stat. § 45:1-25.

## Telemedicine for Specialists Is Lifesaving

19. When patients are referred to physician-specialists like Plaintiffs Drs. MacDonald and Gardner, it is typically due to the patient's local doctors lacking the expertise, experience, or resources to diagnose or treat the patient's unique condition.

20. After a referral is made to a specialist, she or he must first schedule a consultation with the patient to confirm the diagnosis and determine whether the specialist can treat the patient. The specialist must then make specific, nuanced treatment recommendations.

21. New Jersey's telemedicine restrictions mean that patients seeking a consultation with Drs. MacDonald and Gardner must decide whether to incur the cost of traveling out of state to see or talk to the specialist about their condition or options for treatment.

22. For pediatric patients and young adults like Plaintiffs J.A. and Jennings, this burden is exacerbated as their guardians must accompany them. Without the ability to consult before traveling, patients are wholly unaware of whether the specialist will be able to treat the patient. Due to these factors, some patients are unable, or choose not, to

travel and therefore never receive lifesaving treatment from Drs. MacDonald and Gardner.

23.    For those patients who do consult with out-of-state specialists and undergo treatment, follow-up care is critical. While some patients need only simple check-ups, others require periodic and systematic reviews.

24.    With the use of telemedicine, particularly video technology, it is no longer necessary for patients to have to incur costly and time-consuming travel to consult with Drs. MacDonald and Gardner. Patients can forward their medical records for their specialized expert review, and upon meeting for a consultation using telemedicine, they can easily discuss treatment options.

25.    If it is determined that a specialist like Drs. MacDonald and Gardner cannot treat a patient, the use of telemedicine to obtain that information saves the patient the time and expense of travel.

26.    Telemedicine also saves Drs. MacDonald's and Gardner's patients from needing to travel for follow-up care. Telemedicine is used to monitor a patient's progress and any future developments without the patient needing to travel for brief appointments. Objective medical data

(e.g., blood tests, imaging, etc.) can be obtained locally and then reviewed and interpreted during telemedicine visits by out-of-state specialists.

27.    Neither Dr. MacDonald nor Dr. Gardner use telemedicine to directly treat patients.

*J.A.*

28.    Plaintiff J.A. was 18 months old when he was diagnosed with pineoblastoma after his parents noticed he was struggling to walk.

29.    J.A. and his family lived in New York at the time. Upon being referred by their pediatrician to a neurologist, a procedure was quickly scheduled to treat the tumor at a local hospital. With mere days to spare, J.A.'s father, Mike, called every pediatric oncologist in the country he could find to determine if better options existed. After multiple phone calls with out-of-state specialists confirmed that the existing treatment plan was advisable, J.A.'s family chose to proceed.

30.    If not for telemedicine, J.A. and his family would not have been able to travel to consult with all of the specialists they were able to consult with remotely due to financial and time constraints.

31.    When multiple rounds of high-dose chemotherapy and two surgeries were unsuccessful, J.A.'s local doctors referred him to

Dr. MacDonald. Dr. MacDonald reviewed J.A.'s records remotely. After consulting with Dr. MacDonald via telemedicine, J.A.'s family decided to travel to Boston for treatment.

32. Proton therapy under Dr. MacDonald's care was successful for J.A. Nevertheless, pineoblastomas often recur. In the year following J.A.'s proton therapy, he underwent frequent scans to monitor for any problems. J.A.'s family was able to use telemedicine to check-in with Dr. MacDonald to review those scans and monitor his recovery upon returning home to New York.

33. J.A. is now a healthy teenager living in New Jersey, but he still must undergo annual scans—and will do so for the rest of his life. In fact, when an anomaly was identified on one of his follow-up scans, J.A. and his family were able to arrange for a telemedicine consult with Dr. MacDonald where she was able to determine that the anomaly was benign. Should future anomalies appear, J.A. and his family would likewise use telemedicine to consult with Dr. MacDonald.

*Hank Jennings*

34.    Plaintiff Hank Jennings was nineteen years old when he was diagnosed with a giant craniocervical junction chordoma—a rare, large tumor at the base of his skull.

35.    At the urging of his local New Jersey physicians who rarely saw chordomas, Hank and his family consulted with specialists out of state. Within days of his diagnosis, telemedicine allowed Hank and his family to consult with several specialists with expertise in rare chordomas.

36.    If not for telemedicine, Hank and his family would not have been able to consult with the specialists due to both financial and time constraints.

37.    Armed with the knowledge gained through their remote consultations, Hank and his mother relocated from New Jersey to Pittsburgh so Hank could undergo four surgeries to resect his tumor and have specialized inpatient rehabilitation.

38.    Because the chordoma destabilized Hank's cervical spine, his mother temporarily quit working to serve as Hank's primary caregiver during his treatment.

39. Due to the intensity of his treatment, Hank was forced to leave college for a semester. But the treatment was a success and Hank was able to return to school nine months later.

40. While Hank's treatment was successful, periodic follow-ups with his specialists in Pittsburgh are necessary to check his progress and ensure his chordoma does not return. If Hank is forced to travel for every follow-up appointment, he would have to decide between spending considerable time and money to obtain care or forego treatment from his specialist team.

41. Using telemedicine, however, Hank is able to follow-up with his specialists from his college dorm room or from home. Hank's family is even able to join his appointments from their distant home.

### New Jersey's Telemedicine Licensure Rule Burdens Interstate Specialty Medical Practice

*Burdens on Physician-specialists*

42. The initial licensure process for physicians in New Jersey includes: $550 in fees, a background check and fingerprints (along with accompanying fees), and significant documentation. The average processing time for licensure is three months.

43. The New Jersey Legislature enacted legislation in 2022 to join the Interstate Medical Licensure Compact to streamline the process for out-of-state physicians to seek licensure in New Jersey. When the legislation is implemented, the process will still require payment of to-be-determined state fees, plus $700 for participation in the Compact, as well as fingerprinting and background checks.

44. Unlike New Jersey's Temporary Emergency Reciprocity License during the COVID-19 pandemic, which allowed out-of-state physicians to become licensed within 24 hours of applying, the "streamlined" process takes weeks.

45. Maintaining licenses in multiple states is significantly burdensome for Drs. MacDonald and Gardner. Monitoring renewal dates and fees, state-specific continuing education requirements, and other state-specific requirements create administrative barriers that prevent them from seeking licensure in all states where they have patients.

46. For specialists like Drs. MacDonald and Gardner, who have national practices and only occasionally consult with or treat patients from New Jersey, the costs of being licensed in New Jersey are disproportionately significant.

47.    Specialists with national practices like Drs. MacDonald and Gardner do not know in advance where a potential patient will be located. As patients often seek consultations within days of a diagnosis, should Drs. MacDonald and Gardner first need to become licensed in New Jersey, the process would preclude them from consulting with New Jersey patients.

48.    Drs. MacDonald's and Gardner's patients also travel for work or vacation. Should a current patient travel to New Jersey, Drs. MacDonald and Gardner will be unable to see that patient via telemedicine unless they become licensed in New Jersey.

49.    Without a New Jersey license, Drs. MacDonald and Gardner must decide whether to risk criminal and civil liability for having conversations using telemedicine with their New Jersey patients.

50.    Any enforcement action taken in New Jersey against Dr. MacDonald or Dr. Gardner for seeing a New Jersey patient using telemedicine without first being licensed in New Jersey could also result in administrative penalties in states in which Drs. MacDonald and Gardner are licensed.

51.   Many specialists, like Dr. MacDonald, believe it is their ethical duty to maintain ongoing care for their patients. New Jersey's telemedicine licensure rule makes it illegal for Dr. MacDonald to satisfy that ethical duty for her New Jersey patients using telemedicine.

52.   Being unable to use telemedicine to consult with potential New Jersey patients and follow-up with existing New Jersey patients after treatment, as Drs. MacDonald and Gardner intend to do, results in specialists with national practices like Drs. MacDonald and Gardner consulting with and treating fewer patients who need their special expertise.

53.   New Jersey's telemedicine rules also significantly hamper critical research by specialized experts like Drs. MacDonald and Gardner. Many cancer patients seeking specialty care are eligible for participation in clinical trials. The inability to use telemedicine to follow-up with patients after receiving treatment through a clinical trial decreases the chances of success for clinical trials and the number of treatments available for patients.

17

*Burdens on Patients*

54.    Without convenient access to out-of-state specialists, patients like J.A. and Hank Jennings can only avail themselves of local expertise and resources. Forced reliance on limited local expertise and resources can have dire consequences.

55.    For example, with chordomas like the one that afflicted Plaintiff Jennings, had local physicians not recognized the condition and referred him to out-of-state specialists, a typical biopsy might have been performed, a procedure that frequently can lead to the spread of chordomas making cure more challenging and complications more likely.

56.    Likewise, while Plaintiff J.A. initially underwent treatment at a local hospital in New York, the treatment was unsuccessful. Treatment for his rare cancer only succeeded after he was referred to Dr. MacDonald, a national, specialized expert, for additional treatment.

57.    In the critical days following diagnosis with rare cancers and diseases, telemedicine allows patients and their families to consult with specialists. These consultations allow them to obtain expert opinions, uncover unique options, and learn the veracity of initial treatment plans from experts, regardless of location or budget.

58. Without telemedicine, the cost and time commitment required to physically travel to each specialist's office for consultation would preclude most patients from obtaining critical care. Moreover, without the opportunity for an initial consultation, a patient's health may preclude her from traveling even if she had the financial resources.

59. After a patient returns home from treatment, follow-up care is often necessary. For patients like J.A. and Hank, scans need to be routinely performed to ensure their cancers have not returned. Telemedicine allows their out-of-state specialists to review and communicate quickly and efficiently.

60. If J.A. and Hank are unable to use telemedicine for follow-up care, the burden of frequent travel may prevent them from receiving that information and care.

61. Patients of Drs. MacDonald and Gardner often have questions or concerns about their progress during recovery. If they are unable to use telemedicine to discuss those questions, the patient will seek out a local doctor lacking the necessary expertise and personal context.

62. Patients of Drs. MacDonald and Gardner often travel for work or vacation. Should a patient need an appointment while traveling in

19

New Jersey, the state's telemedicine rules prevent them from receiving that critical care.

## The Telemedicine Licensure Rules
## Were Suspended During the COVID-19 Pandemic

63. In response to the COVID-19 pandemic, the telemedicine licensure rule was relaxed in two ways.

64. First, regardless of whether a pre-existing doctor-patient relationship existed, any physician not licensed in New Jersey could see a New Jersey patient using telemedicine to screen for, diagnose, and treat COVID-19. So long as a pre-existing doctor-patient relationship was established, a physician could use telemedicine to see his or her New Jersey patients without a New Jersey license.

65. Second, the New Jersey State Board of Medical Examiners implemented a streamlined Temporary Emergency Reciprocity License program for physicians not licensed in New Jersey permitting them to conduct the full range of care appropriate for telemedicine as if they were a permanently licensed New Jersey physician. The temporary program waived application fees and allowed qualified applicants to become licensed within 24 hours of applying.

66. The temporary license program expired on March 31, 2023.

67.   On March 31, 2023, the Deputy Director of the New Jersey Division of Consumer Affairs directed all holders of the temporary license to "cease and desist from engaging in any further practice" in New Jersey, effective April 1, 2023, unless the individual had obtained plenary licensure in New Jersey.

68.   There are no reports that any New Jersey patient was harmed from telemedicine care provided by an out-of-state physician-specialist during the COVID-19 pandemic regardless of the specialist's state of licensure.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Commerce Clause's Protection of Interstate Practice of Medicine

69.   Plaintiffs reallege and incorporate by reference all allegations contained in the previous paragraphs.

70.   The Commerce Clause of the United States Constitution, Article I, § 8, cl. 3, gives Congress the exclusive power to regulate interstate commerce. This power restrains the legislative power of the states even when Congress has not expressly exercised that power—a doctrine known as the "dormant" Commerce Clause.

71.  Under the Dormant Commerce Clause, states are prohibited from enacting laws that excessively burden interstate commerce in relation to its putative local benefits.

72.  New Jersey's telemedicine licensure rule, N.J. Stat. § 45:1-62(b), prohibits out-of-state specialists like Plaintiffs Drs. MacDonald and Gardner from using telemedicine to consult with potential patients in New Jersey, and to check-in with current patients like Plaintiffs J.A. and Jennings in New Jersey following specialized treatment, unless the specialists first undergo the burdensome process of becoming licensed in New Jersey.

73.  N.J. Stat. § 45:1-62(b) also directly regulates interstate commerce by forbidding the use of telemedicine across state lines.

74.  N.J. Stat. § 45:1-62(b) restricts and substantially burdens the practice of medicine across state lines by prohibiting out-of-state specialists from consulting and following up with New Jersey patients via telemedicine.

75.  N.J. Stat. § 45:1-62(b) places a substantial burden on the interstate practice of specialty medicine via telemedicine provided to

22

New Jersey patients by out-of-state specialists that is not justified by any putative local benefit.

76.  Shielding in-state New Jersey physicians from competing with out-of-state specialists is not a legitimate local benefit. Nor is that interest furthered by N.J. Stat. § 45:1-62(b), as the most likely result of the rule is patients not having access to specialty care available outside of New Jersey.

77.  Plaintiffs have suffered and will continue to suffer substantial and irreparable harm unless N.J. Stat. § 45:1-62(b) is declared unlawful and enjoined by this Court as applied to out-of-state specialists.

## SECOND CLAIM FOR RELIEF

### Violation of Privileges and Immunities Clause's Protection of Interstate Practice of Medicine

78.  Plaintiffs reallege and incorporate by reference all allegations contained in the previous paragraphs.

79.  The Privileges and Immunities Clause of Article IV, § 2, cl. 1 of the United States Constitution establishes that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Among the rights protected by the Clause is the right to practice an occupation.

23

80.    N.J. Stat. § 45:1-62(b) prohibits out-of-state specialists like Drs. MacDonald and Gardner from practicing medicine across state lines using telemedicine to consult with potential patients in New Jersey, and to check-in with their current patients in New Jersey following treatment.

81.    No known harms befell New Jerseyans when the telemedicine licensure rule was relaxed during the COVID-19 pandemic. The most evident purpose in Defendant's continuing enforcement of section 45:1-62(b) is to protect in-state physicians from competing with out-of-state specialists.

82.    Section 45:1-62(b) has discriminatory effects against out-of-state specialists with national practices like Plaintiffs MacDonald and Gardner. For example, the burdens of obtaining and maintaining a New Jersey medical license, in addition to a specialist's primary license, are prohibitive for out-of-state specialists who only occasionally consult and follow-up with patients in New Jersey.

83.    Section 45:1-62(b) is not supported by a substantial reason for its discriminatory effects on out-of-state specialists, nor does the

24

discrimination bear a substantial relationship to any legitimate state objective.

84.    The requirements for New Jersey licensure mirror, in all material respects, the requirements for licensure in Massachusetts and Pennsylvania, respectively.

85.    Less restrictive alternatives to licensure are available to regulate telemedicine in New Jersey by out-of-state specialists.

86.    Plaintiffs have suffered and will continue to suffer substantial and irreparable harm unless section 45:1-62(b) is declared unlawful and enjoined by this Court as applied to out-of-state specialists.

## THIRD CLAIM FOR RELIEF

### Violation of Plaintiffs' First Amendment
### Right to Freedom of Speech

87.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1–68.

88.    The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, protects the ability of physicians and patients to discuss potential treatment and to check in after treatment.

89.    Plaintiffs MacDonald and Gardner have the right to consult with potential patients in New Jersey to determine whether they can treat the patient, and to have periodic conversations with patients in New Jersey following in-person treatment.

90.    Plaintiffs J.A., Jennings, and Abell have the right to engage in conversations with their out-of-state specialists concerning treatment.

91.    N.J. Stat. § 45:1-62(b) restricts Drs. MacDonald's and Gardner's ability to speak with potential New Jersey patients who may require their expert care.

92.    Section 45:1-62(b) likewise restricts the ability of Plaintiffs J.A., Jennings, and Abell to use telemedicine to share and receive information to consult with specialists like Drs. MacDonald and Gardner to understand all their treatment options and to discuss progress and concerns following treatment.

93.    Restricting Plaintiffs Gardner and MacDonald from using telemedicine to conduct initial consultations and check in with potential and existing patients in New Jersey burdens their rights to free speech.

94.    Restricting Plaintiffs J.A., Jennings, and Abell from using telemedicine to share information with and receive information from out-

of-state specialists following in-person treatment burdens their right to free speech.

95. Section 45:1-62(b) is a content-based restriction on Plaintiffs' freedom of speech because it requires government officials to thoroughly review the content of a conversation with a patient to determine whether the conversation was made for the purpose of providing or supporting a health care service.

96. Section 45:1-62(b) is also a speaker-based restriction on Plaintiffs' freedom of speech because its restrictions apply based on the physician's licensure.

97. Section 45:1-62(b) is not sufficiently tailored to serve a compelling government interest.

98. By preventing Plaintiffs MacDonald and Gardner from using telemedicine to consult with potential patients in New Jersey and check in with existing patients in New Jersey, Defendant maintains and actively enforces a set of laws, practices, policies, and procedures under color of state law that deprive Plaintiffs of their rights to free speech, in violation of the First Amendment to the United States Constitution, as

applied to the States through the Fourteenth Amendment and 42 U.S.C. § 1983.

99.    By preventing Plaintiffs J.A., Jennings, and Abell from using telemedicine to talk to their out-of-state specialists for the purpose of monitoring Plaintiffs following treatment, Defendant maintains and actively enforces a set of laws, practices, policies, and procedures under color of state law that deprive Plaintiffs of their rights to free speech, in violation of the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment and 42 U.S.C. § 1983.

100.  Plaintiffs have no adequate remedy at law to compensate for the loss of their freedom of speech and will suffer irreparable injury absent an injunction prohibiting Defendant's enforcement of the licensure requirement in section 45:1-62(b) as applied to out-of-state physician-specialists.

### FOURTH CLAIM FOR RELIEF

### Violation of Plaintiff Abell's Right to Direct His Child's Medical Care

101. Plaintiff Abell realleges and incorporates by reference all allegations contained in paragraphs 1–68.

102. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law."

103. Among the rights protected by the Due Process Clause is the right of parents to make decisions concerning the care, custody, and control of their children.

104. The right to direct the care, custody, and control of a child includes Plaintiff Abell's right to seek lawful medical care for his son, Plaintiff J.A.

105. N.J. Stat. § 45:1-62(b) restricts Plaintiff Abell's ability to seek lawful lifesaving medical care for J.A.

106. Rather than protecting the health or well-being of children, section 45:1-62(b) endangers children like J.A., who suffer from rare cancers and must seek lawful specialty treatment from experts, by restricting access to those experts.

107. Section 45:1-62(b) is not narrowly tailored to serve a compelling government interest.

108. By preventing Plaintiff Abell from seeking lawful medical care for his son, Defendant maintains and actively enforces a set of laws,

29

practices, policies, and procedures under color of state law that deprives Plaintiff Abell of his due process rights, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

109.  Plaintiff Abell has no adequate remedy at law to compensate for the loss of his due process rights and will suffer irreparable injury absent an injunction prohibiting Defendant's enforcement of the licensure requirement in section 45:1-62(b) as applied to out-of-state physician-specialists.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    A declaration that N.J. Stat. § 45:1-62(b), as applied to licensed out-of-state specialists Drs. MacDonald and Gardner, violates the Dormant Commerce Clause and Privileges and Immunities Clause of the U.S. Constitution, as well as the First and Fourteenth Amendments to the U.S. Constitution;

B.    A declaration that N.J. Stat. § 45:1-62(b), as applied to Plaintiffs J.A., Jennings, and Abell, violates the Dormant Commerce Clause and the First and Fourteenth Amendments;

C.     A permanent injunction restraining Defendant and Defendant's officers, agents, affiliates, servants, successors, employees, and all other persons in active concert or participation with Defendant from enforcing N.J. Stat. § 45:1-62(b) against Plaintiffs;

D.     An award of attorney fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

E.     Any further relief as the Court may deem just, necessary, or proper.

DATED:  December 13, 2023.

Respectfully submitted,


/s/ *Jonathan M. Houghton*
JONATHAN M. HOUGHTON
N.J. Bar No. 369652021
JACK E. BROWN
Virginia Bar No. 94680*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
JHoughton@pacificlegal.org
JBrown@pacificlegal.org

CALEB R. TROTTER
Cal. Bar No. 305195*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
CTrotter@pacificlegal.org

* *Pro Hac Vice Motions Forthcoming*

*Counsel for Plaintiffs*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I, Jonathan Houghton, hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated: December 13, 2023.

/s/ *Jonathan M. Houghton*
JONATHAN M. HOUGHTON