# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY
# VICINAGE OF CAMDEN

| | |
|---|---|
| DR. SHANNON MACDONALD, M.D., DR. PAUL GARDNER, M.D., J.A., a minor, by and through guardian and next friend MICHAEL ABELL, MICHAEL ABELL, and HANK JENNINGS, | Hon. Edward S. Kiel, U.S.D.J. Hon. Sharon A. King, U.S.M.J. CIVIL ACTION NO. 1:23-CV-23044-ESK-SAK |
| Plaintiffs, v. | **CIVIL ACTION** **(ELECTRONICALLY FILED)** |
| OTTO F. SABANDO, in his official capacity as President of the New Jersey State Board of Medical Examiners, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Angela Cai
*Deputy Solicitor General*

Steven Flanzman
Christopher Ioannou
Siobhan Krier
*Deputy Attorneys General*

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF
NEW JERSEY

R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
*Attorneys for Defendant*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................3

    A.  The Licensing Requirement. .......................................................3

    B.  The Parties and Complaint. ..........................................................8

STANDARD OF REVIEW ......................................................................10

ARGUMENT ........................................................................................10

  I.   THE LICENSING REQUIREMENT DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.................................................10

    A.  The *Pike* Balancing Test, Not Heightened Scrutiny, Applies....................12

    B.  The Licensing Requirement Satisfies the *Pike* Balancing Test. ................16

  II.  THE LICENSING REQUIREMENT DOES NOT VIOLATE THE PRIVILEGES AND IMMUNITIES CLAUSE ....................................21

    A.  The Licensing Requirement Is Neither Discriminatory Nor Protectionist .21

    B.  The Requirement Is Substantially Related to Important Government Interests ........................................................................................24

  III.   THE LICENSING REQUIREMENT DOES NOT VIOLATE THE FIRST AMENDMENT. .......................................................................26

    A.  The Licensing Requirement Is Content-Neutral And Requires Only Rational Basis. .......................................................................27

    B.  Under Either Rational Basis Or Intermediate Scrutiny, The Licensing Requirement Survives.....................................................................31

  IV.   THE LICENSING REQUIREMENT DOES NOT VIOLATE THE FOURTEENTH AMENDMENT. .......................................................36

CONCLUSION ......................................................................................38

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**          **Page(s)**

*A.L. Blades & Sons, Inc. v. Yerusalim*,
   121 F.3d 865 (3d Cir. 1997)........................................................................21

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
   669 F.3d 359 (3d Cir. 2012).......................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................10

*Bd. of Tr. of State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989)...................................................................................32

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................10

*Brokamp v. James*,
   66 F.4th 374, (2d Cir. 2023) ............................................................. passim

*Bruni v. City of Pittsburgh*,
   941 F.3d 73 (3d Cir. 2019)........................................................................32

*C&A Carbone, Inc. v. Town of Clarkstown*,
   511 U.S. 383 (1994)...................................................................................11

*Capital Associated Indus. v. Stein*,
   922 F.3d 198 (4th Cir. 2019) ............................................... 29, 30, 31, 36

*City of Austin v. Reagan National Advertising of Austin*,
   596 U.S. 61 (2022)............................................................................. 28, 29

*City of Philadelphia v. New Jersey*,
   437 U.S. 617 (1978)........................................................................... 17, 19

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998)....................................................................10

*Cloverland–Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
    462 F.3d 249 (3d Cir. 2006)....................................................................11

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987)....................................................................................20

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
    26 F.4th 1214 (11th Cir. 2022) ..............................................................30

*Dent v. West Virginia*,
    129 U.S. 114 (1889)....................................................................... passim

*Doe v. Governor of N.J.*,
    783 F.3d 150 (3d Cir. 2015)............................................................ 37, 38

*F.C.C. v. Beach Comm'cns, Inc.*,
    508 U.S. 307 (1993)..................................................................................31

*General Motors Corp. v. Tracy*,
    519 U.S. 278 (1997).......................................................................... 17, 20

*Goldfarb v. Va. State Bar*,
    421 U.S. 773 (1975)..................................................................................27

*Gray v. Dep't of Public Safety*,
    248 A.3d 212 (Me. 2021)................................................................. 31, 36

*Hillside Dairy Inc. v. Lyons*,
    539 U.S. 59 (2003)....................................................................................22

*In re Polk*,
    449 A.2d 7 (N.J. 1982)..............................................................................4

*Kassel v. Consol. Feightways Corp. of Del.*,
   450 U.S. 662 (1981) .................................................................. 16, 17, 20

*King v. Governor of New Jersey*,
   767 F.3d 216 (3d Cir. 2014)...................................................... 28, 29

*Kleinsmith v. Shurtleff*,
   571 F.3d 1033 (10th Cir. 2009) .................................................. 15, 22

*Leis v. Flynt*,
   439 U.S. 438 (1979)........................................................................35

*Locke v. Shore*,
   634 F.3d 1185 (11th Cir. 2011) .......................................... 14, 16, 17, 21

*Mazo v. N.J. Sec'y of State*,
   54 F.4th 124 (3d Cir. 2022) ..........................................................29

*McBurney v. Young*,
   569 U.S. 221 (2013)............................................................. 22, 23, 24

*McCullen v. Coakley*,
   573 U.S. 464 (2014)................................................................ 32, 35

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)........................................................................25

*Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Berch*,
   773 F.3d 1037 (9th Cir. 2014) ..................................................... 14, 26

*Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Castille*,
   799 F.3d 216 (3d Cir. 2015)..................................................... passim

*Nat'l Inst. Of Fam. & Life Advocates v. Becerra*,
   585 U.S. 755 (2018)........................................................ 27, 29, 30, 32

iv

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993)...................................................................6

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970) ................................................................... passim

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ............................................................... 26, 29

*Sammon v. N.J. Bd. of Med. Examiners*,
   66 F.3d 639 (3d Cir. 1995)....................................................... 37, 38

*Schoenefeld v. Schneiderman*,
   821 F.3d 273 (2d Cir. 2016)..................................................................23

*Thomas v. Chi. Park Dist.*,
   534 U.S. 316 (2002)...............................................................................27

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) ..............................................................30

*Tolchin v. Supreme Court of New Jersey*,
   111 F.3d 1099 (3d Cir. 1997)....................................................... passim

*Toomer v. Witsell*,
   334 U.S. 385 (1948).............................................................. 24, 26

*Troxel v. Granville*,
   530 U.S. 57 (2000)...............................................................................37

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ..........................................................................31

*United Bldg. & Constr. Trades Council of Camden County and Vicinity v. Mayor
   and Council of the City of Camden*,
   465 U.S. 208 (1984)...............................................................................21

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
  550 U.S. 330 (2007) ................................................................11

*Watson v. State of Maryland*,
  218 U.S. 173 (1910) ................................................................35

*Zahl v. Harper*,
  282 F.3d 204 (3d Cir. 2002) ................................ 4, 18, 25, 32

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ................................................10

U.S. Const. art. IV, § 2 ....................................................21

**Statutes**

N.J. Admin. Code § 13:35-3.1 to -3.15 ..............................4, 5

N.J. Admin. Code § 13:35-6 ........................................ 4, 5, 8

N.J. Stat. Ann. § 2C:21-20 .................................................5

N.J. Stat. Ann. § 2C:43-3 ..................................................5

N.J. Stat. Ann. § 45:1-7.5 ....................................... 5, 19, 34

N.J. Stat. Ann. § 45:1-18 ...............................................5, 6

N.J. Stat. Ann. § 45:1-23 ..................................................5

N.J. Stat. Ann. § 45:1-25 ..................................................6

N.J. Stat. Ann. § 45:1-61 ......................................... 7, 8, 12

N.J. Stat. Ann. § 45:1-62 .......................................... 7, 12, 15

N.J. Stat. Ann. § 45:9-6 ........................................ 4, 5, 7, 19

N.J. Stat. Ann. § 45:9-12 ............................................................................................4

**Other Authorities**

Caleb Trotter, *In 30 states, you can't use telehealth with out-of-state doctors*,
  Pacific Legal Foundation, https://pacificlegal.org/30-states-telehealth-rules/
  (Dec. 13, 2023) .........................................................................................................6

Fed'n of State Medical Bds., Comparison of States with Permanent Interstate
  Telemedicine, https://www.fsmb.org/siteassets/advocacy/key-issues/comparison-
  of-states-with-permanent-interstate-telemedicine.pdf (Feb. 2024) ........................6

**INTRODUCTION**

A heartland exercise of a State's police powers is regulating the practice of medicine within its borders. To protect their citizens' health and safety, States can and must ensure medical practitioners are qualified to treat patients. For centuries, they have done so by requiring that those seeking to care for patients within the State's borders obtain a license assuring those qualifications. That longstanding practice extends to newer forms of the practitioner-patient relationship, including telehealth, through which practitioners remotely treat in-state patients.

Plaintiffs, including practitioners, patients, and their parents, seek to subvert New Jersey's exercise of that core power. They allege that New Jersey law—which requires *all* medical practitioners who treat patients in New Jersey to be licensed, regardless of where the practitioners reside and regardless of whether they deliver those services in-person or via telehealth—violates the United States Constitution's dormant Commerce Clause, Privileges and Immunities Clause, First Amendment right to free speech, and Fourteenth Amendment right to due process. All of their claims fail as a matter of law.

First, New Jersey's licensing requirement does not violate the dormant Commerce Clause. As a basic assurance of a practitioner's qualifications which does not discriminate between resident and non-resident practitioners, the requirement comes nowhere near the kind of economic protectionism with which the Clause is

1

concerned. Because it does not discriminate against interstate commerce, the requirement is subject to a basic balancing test, which it easily meets. It effectuates a legitimate local public interest, its effects on interstate commerce are only incidental, and any supposed burden imposed on interstate commerce is marginal relative to the significant local benefits.

Nor does the licensing requirement run afoul of the Privileges and Immunities Clause, for similar reasons. It applies equally to all practitioners who treat New Jersey patients, regardless of a practitioner's state of residence. As a law that does not discriminate against out-of-state practitioners in an economically protectionist way, it is simply not the kind of legislation the Clause guards against. And even if it were, the licensing requirement is amply justified by the State's exceedingly strong interest in regulating the practice of medicine to ensure its citizens' health and safety.

Plaintiffs' First Amendment claim also fails. Because the law at issue is a content-neutral exercise of New Jersey's broad power to establish standards for licensing practitioners and regulating the practice of medicine, it need only pass rational-basis review, which it categorically does. But even if intermediate scrutiny applied, the law would easily satisfy that test, too. The licensing requirement directly advances the State's important interest in protecting patients from ineffective or unqualified medical practitioners, and is sufficiently drawn to serve that interest.

Finally, the licensing requirement does not violate the parent Plaintiff's Fourteenth Amendment due-process right to control his child's medical care. Third Circuit caselaw is crystal-clear: parents have no right to choose their child's particular health care provider, especially where that provider does not meet the State's licensing standards. That holding forecloses the due-process claim.

Though Plaintiffs doubtless disagree with the State's licensing requirement for telehealth services, their reliance on the Constitution to resolve that disagreement is fundamentally misplaced. Their arguments against the requirement belong before the State's legislature, not courts. As such, this Court should dismiss Plaintiffs' complaint with prejudice.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. The Licensing Requirement.

As the Supreme Court has explained as far back as 1889, "it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). And "[f]ew professions require more careful preparation by one who seeks to enter it than that of medicine." *Id.* Given the needed knowledge "of the human body in all its complicated parts," and the high stakes involved, "[r]eliance must be placed upon the assurance given by [a medical practitioner's] license, issued by an authority competent to judge in that respect, that

3

he possesses the requisite qualifications." *Id.* at 122-23. So, "for the protection of society," a state may "exclude from practice those who have not such a license, or who are found upon examination not to be fully qualified." *Id.* at 123. And protecting society by regulating—through licensing—the practice of medicine within the State's borders is an interest federal and state courts alike have recognized as "exceedingly strong" and "paramount." *Zahl v. Harper*, 282 F.3d 204, 210-12 (3d Cir. 2002); *In re Polk*, 449 A.2d 7, 14-15 (N.J. 1982) (describing interest as "substantial," "deep," and "paramount").

New Jersey is no exception to that enduring tradition. As Title 45 of the State's statutes makes clear, "[a]ll persons commencing the practice of medicine or surgery in th[e] State shall apply to the board [of medical examiners] for a license to do so." N.J. Stat. Ann. § 45:9-6. It is for the Board to examine an applicant's qualifications, and, if satisfied with those qualifications, issue the applicant a medical license. *E.g.*, *id.*; § 45:9-12; N.J. Admin. Code § 13:35-3.1 to -3.15. A successful applicant must pay the Board an initial application fee of $325.00, a one-time endorsement fee of $225.00, and an initial license fee of either $580.00 or $290.00 (depending on whether the license is issued in the first or second year of the two-year licensure cycle). N.J. Admin. Code § 13:35-6.13. Practitioners already licensed in other states can secure a New Jersey license in two ways. First, a practitioner licensed in another state with "substantially equivalent" standards as New Jersey may get licensed upon

4

submitting an application, undergoing a background check, demonstrating that the other license "is valid, current, and in good standing," and paying the same application fees as a physician applying directly to New Jersey (i.e., not through reciprocity). N.J. Stat. Ann. § 45:1-7.5; N.J. Admin. Code § 13:35-6.13. Second, and recently, New Jersey entered the Interstate Medical Licensure Compact, under which eligible practitioners may, upon obtaining a letter of qualification from their "state of principal license" verifying eligibility and the satisfaction of a background check, obtain an expedited license to practice in New Jersey. N.J. Stat. Ann. § 45:9-6.2.[1]

But, consistent with its historically strong prerogative, the State forbids the unlicensed practice of medicine. Someone who "knowingly does not possess a license," and "engages in th[e] practice" of medicine in New Jersey anyway, is guilty of a third-degree crime (punishable by 3-5 years' imprisonment) and subject to criminal fines of up to $15,000. *Id.* §§ 2C:21-20, 2C:43-3(b)(1),-6(a)(3). The Board is authorized to order an unlicensed practitioner to "immediately cease and desist" treating patients, *id.* § 45:1-18.2(b)(1), and the State Attorney General is authorized to seek "an injunction prohibiting" the unlicensed practice of medicine, *id.* § 45:1-23. An unlicensed practitioner may also be liable for a first-time civil penalty of up

---

[1] Once licensed in New Jersey, all practitioners must renew their license every two years and pay a biennial fee of $580.00. N.J. Admin. Code § 13:35-6.13(a)(1)(vi).

to $10,000, and up to $20,000 for subsequent violations. *Id.* §§ 45:1-18.2(b)(2), -25(a).

Over time, as with many other facets of society, the advance of technology has changed the practice of medicine. In many instances, practitioners no longer need to meet face-to-face with their patients to treat them. Wider access to the internet, improving technological platforms, and the COVID-19 pandemic have drastically increased the use of such virtual treatment, known as telehealth or telemedicine.[2]

New Jersey, like many other States, has responded to this new technology by permitting telehealth. But like many other States,[3] New Jersey applies the same licensing standards for in-person treatment as for treatment via telehealth and

---

[2] Unless otherwise specified, "telehealth" and "telemedicine" are used interchangeably throughout.

[3] According to a recent 50-state survey, 30 states also require full licensing for any practitioner who wishes to practice telehealth or in-person services. Eight states require a separate, special license for telehealth. *See* Fed'n of State Medical Bds., Comparison of States with Permanent Interstate Telemedicine, https://www.fsmb.org/siteassets/advocacy/key-issues/comparison-of-states-with-permanent-interstate-telemedicine.pdf (Feb. 2024). This Court may take judicial notice of the compilation of state statutes, especially since Plaintiff's counsel has relied on the same source. *See* Caleb Trotter, *In 30 states, you can't use telehealth with out-of-state doctors*, Pacific Legal Foundation, https://pacificlegal.org/30-states-telehealth-rules/ (Dec. 13, 2023); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993) (allowing documents outside the four corners of the complaint to be considered on a motion to dismiss when "the plaintiff obviously is on notice of the contents of the document").

telemedicine services. *See* N.J. Stat. Ann. § 45:9-6.2 (Interstate Medical Licensure Compact). Because the practice of medicine occurs where the patient is located, a practitioner treating a patient situated in New Jersey must be licensed by the Board to practice medicine in New Jersey, regardless if she does so in-person or remotely, and if remotely, regardless if she herself is in New Jersey. *Id.* So, under New Jersey law, "[a]ny health care provider who uses telemedicine or engages in telehealth while providing health care services to a patient, shall . . . be validly licensed . . . pursuant to Title 45 . . . to provide such services in the State of New Jersey." *Id.* § 45:1-62(b).

The State defines telehealth as "the use of information and communications technologies, including telephones, remote patient monitoring devices, or other electronic means, to support clinical health care, provider consultation, . . . and other services." *Id.* § 45:1-61. And it defines telemedicine as "the delivery of a health care service using electronic communications, information technology, or other electronic or technological means to bridge the gap between a health care provider who is located at a distant site and a patient who is located at an originating site." *Id.*[4] An originating site is where "a patient is located at the time that health care

---

[4] But telemedicine "does not include the use, *in isolation*, of electronic mail, instant messaging, phone text, or facsimile transmission." N.J. Stat. Ann. § 45:1-61 (emphasis added).

services are provided . . . by means of telemedicine or telehealth." *Id.* A distant site is where a health care provider "is located while providing health care services by means of telemedicine or telehealth." *Id.* As the law emphasizes, a health care provider working at a distant site must still be "acting within the scope of a valid license . . . issued pursuant to Title 45." *Id.*[5]

**B. The Parties and Complaint.**

Plaintiffs are a group of practitioners, patients, and parents who take issue with New Jersey's telehealth-licensing requirement. Plaintiff Shannon MacDonald, M.D., a resident of Massachusetts, is a radiation oncologist at Massachusetts General Hospital who specializes in rare pediatric cancers and proton therapy. Compl., D.I. 1, ¶ 7. Dr. MacDonald treats Plaintiff J.A., a resident of New Jersey, whose father is Plaintiff Michael Abell, another New Jersey resident. *Id.* ¶¶ 9-10. As a young child, J.A. suffered from pineoblastoma, and was treated by Dr. MacDonald with proton therapy in Boston. *Id.* ¶¶31-32. J.A.'s treatment was successful, but he continues to need annual scans to monitor his recovery; he and Mr. Abell want to use telemedicine to consult with Dr. MacDonald. *Id.* ¶¶ 32-33.

---

[5] New Jersey law makes clear that providers who merely "consult[] with a licensee in New Jersey . . . but do[] not direct patient care . . . will not be required to obtain licensure in New Jersey in order to provide such consultation." N.J. Admin. Code § 13:35-6B.1(d).

Plaintiff Paul Gardner, M.D., a resident of Pennsylvania, is an expert neurosurgeon at the University of Pittsburgh Medical Center who specializes in skull base surgery. *Id.* ¶ 8. Plaintiff Hank Jennings, a New Jersey resident, was diagnosed as a teenager with a tumor at the base of his skull. *Id.* ¶ 34. He traveled to Pittsburgh for four surgeries resecting his tumor. *Id.* ¶ 37. (It is unclear, on the face of the Complaint, whether Dr. Gardner himself treated or still treats Mr. Jennings.) Those surgeries were successful, though Mr. Jennings still needs periodic follow-ups with his specialists in Pittsburgh, and would like to use telemedicine for those follow-ups. *Id.* ¶¶ 40-41.

Despite J.A. and Mr. Jennings wanting to be treated through telemedicine, Drs. MacDonald and Gardner refuse to get licensed in New Jersey. So rather than the Doctors simply paying the applicable fees and securing New Jersey medical licenses, *see id.* ¶¶ 42-45, Plaintiffs filed suit against Otto F. Sabando, D.O., President of the Board of Medical Examiners, challenging the telehealth-licensing requirement. *See generally* Compl. All Plaintiffs allege that the requirement violates the dormant Commerce Clause and their First Amendment right to free speech. *Id.* ¶¶ 69–77, 87-100. The Doctor Plaintiffs further allege that the requirement violates Article IV's Privileges and Immunities Clause, *id.* ¶¶ 78-86, and Plaintiff Michael Abell alleges that it violates his Fourteenth Amendment due-process right to direct his child's medical care, *id.* ¶¶ 101-109. Plaintiffs seek a declaration that the

9

requirement is unlawful as-applied to them and an injunction restraining Dr. Sabando, in his official capacity, from enforcing it against them. *Id.* at 30-31.

## STANDARD OF REVIEW

In assessing a motion to dismiss for failure to state a claim, this Court must ask whether Plaintiffs' Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To answer that question, the Court may also consider exhibits attached to the Complaint and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). But the Court may not accept Plaintiffs' "legal conclusions," which it must evaluate for itself. *Iqbal*, 556 U.S. at 678. Nor do [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, . . . suffice." *Id.*

## ARGUMENT

### I. THE LICENSING REQUIREMENT DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

Under the Commerce Clause, Congress has the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "This clause also has an implied requirement (often called the 'negative' or 'dormant' aspect of the clause) that states not 'mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Cloverland–Green Spring*

*Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006) (citation omitted). In other words, the dormant Commerce Clause "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross* (*NPPC*), 598 U.S. 356, 369 (2023) (cleaned up).

In assessing a dormant Commerce Clause claim, courts first ask "whether heightened scrutiny applies, and, if not, then ... whether the law is invalid under the *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), balancing test." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 373 (3d Cir. 2012). Heightened scrutiny applies if a law "'discriminates against interstate commerce' in purpose or effect." *Id.* (quoting *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)). "Discriminatory laws motivated by simple economic protectionism are subject to a virtually per se rule of invalidity, which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007) (cleaned up). By contrast, under *Pike*, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless

the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142 (citation omitted).

### A. The *Pike* Balancing Test, Not Heightened Scrutiny, Applies.

Heightened scrutiny is inapplicable for two reasons. First, the telehealth-licensing requirement is neither facially nor effectively discriminatory against out-of-state practitioners. And second, the licensing requirement is in no way motivated by economic protectionism.

As the Supreme Court recently emphasized, "purposeful discrimination against out-of-state economic interests" is "at the core of [its] dormant Commerce Clause cases." *NPPC*, 598 U.S. at 371; *accord id.* at 369. But the licensing requirement does not discriminate against out-of-state practitioners at all. The requirement, as mentioned, applies to "*[a]ny* health care provider" who uses telehealth to treat a patient in New Jersey. N.J. Stat. Ann. § 45:1-62(b) (emphasis added); *see also* § 45:1-61 (defining "health care provider" as "an individual who provides a health care service to a patient"). Practitioners who *reside in New Jersey* must also be licensed in New Jersey in order to treat New Jersey patients via telehealth. Thus, a physician located in Cape May who treats her New Jersey patients via telehealth is subject to the identical rules as Dr. MacDonald in Boston and Dr. Gardner in Pittsburgh.

12

Courts have consistently held that such evenhanded regulation does not merit heightened scrutiny. Consider *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099 (3d Cir. 1997), which upheld against a dormant Commerce Clause challenge a New Jersey court rule requiring attorneys to maintain a New Jersey office and attend continuing legal education courses in order to practice in the State. As the *Tolchin* court explained, the office rule "on its face" did "not discriminate against out-of-state attorneys." *Id.* at 1107. Nor, explained the court, did the rule "effectively favor[] resident attorneys": Because "[a]ll attorneys who wish to practice in New Jersey must have a bona fide office," and the requirement effectively targeted the "occasional practice in New Jersey" by attorneys "who now practice[] primarily in another state," it was "reasonable to assume that the only attorneys actually burdened by this requirement are those who wish to maintain small or sporadic practices in New Jersey." *Id.* Since "[a]ny incidental discrimination caused by the bona fide office requirement [wa]s not based on residency status, but on the size and type of an attorney's practice," heightened scrutiny was "not applicable." *Id.* at 1108.

Plaintiffs run headlong into *Tolchin*'s holding. They allege that the licensing requirement's effects are "discriminatory . . . against out-of-state specialists with national practices" because "the burdens of obtaining and maintaining a New Jersey medical license, in addition to a specialist's primary license, are prohibitive for out-of-state specialists who *only occasionally* consult and follow-up with patients in

13

New Jersey." Compl. ¶ 82 (emphasis added).[6] But that allegation "fails to implicate the [dormant] Commerce Clause because such [practitioners] may be New Jersey residents as well as nonresidents." *Tolchin*, 111 F.3d at 1107. As in *Tolchin*, any "incidental discrimination caused by the [licensing] requirement is not based on residency status, but on the size and type of a[ provider's] practice." *Id.* at 1108.

For the same reason, other licensing requirements that do not discriminate against non-resident professionals have likewise been exempted from heightened scrutiny. *See, e.g.*, *Locke v. Shore*, 634 F.3d 1185, 1192-94 (11th Cir. 2011) (Florida's license requirement for commercial interior designers subjected to *Pike* balancing test because it did "not discriminate against out-of-state residents"); *see also Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Castille*, 799 F.3d 216, 225 (3d Cir. 2015) (Pennsylvania requirement allowing attorneys barred in reciprocal states to be admitted by motion rather than taking the bar examination subjected to *Pike* because it did "not classify applicants based on residence"); *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Berch*, 773 F.3d 1037, 1049 (9th Cir. 2014) (same, because "Arizona['s equivalent provision] requires the same of its citizens as it does citizens of other states"); *Kleinsmith v. Shurtleff*, 571

---

[6] Although Plaintiffs make this allegation under their Privilege and Immunities claim, the same alleged discrimination applies to their dormant Commerce claim, too. *See Tolchin*, 111 F.3d at 1107-08, 1113 (similarly treating discrimination for both types of claims).

F.3d 1033, 1040-43 (10th Cir. 2009) (Utah requirement that trust-deed trustee attorneys maintain an in-state meeting place subjected to *Pike* because the requirement applied "whether the attorney is a resident or a nonresident"). The telehealth-licensing requirement is no different.

Thus, Plaintiffs' allegation that the requirement "directly regulates interstate commerce by forbidding the use of telemedicine across state lines" falls far short. Compl. ¶ 73. For one, that conclusory assertion is plainly false: New Jersey forbids the use of *unlicensed* telemedicine, and indeed *encourages* the use of telemedicine and telehealth (including across state lines) "[u]nless specifically prohibited or limited by federal or State law." N.J. Stat. Ann. § 45:1-62(a). For another, whether the requirement "directly regulates interstate commerce" is beside the point; what matters is whether the licensing requirement "*purposely discriminate[s]* against out-of-state economic interests"—the "core" question underlying the dormant Commerce Clause inquiry. *NPPC*, 598 U.S. at 369-71 (emphasis added); *see also id.* at 376 & n.1 (suggesting that an allegation of directly regulating out-of-state commerce, without discrimination, is not "a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers"). As discussed, it does not.

The licensing requirement is also not subject to heightened scrutiny for a second, independent reason: it is not "driven by economic protectionism." *Id.* at 369.

Instead, it is part of the longstanding tradition of licensing regulations enacted "for the protection of society," *Dent*, 129 U.S. at 122-23, and as such, it is a "bona fide safety regulation[ that] must overcome a strong presumption of validity," *Kassel v. Consol. Feightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality op.) (internal quotation marks and citation omitted). *See also Locke*, 634 F.3d at 1194-95 (applying *Pike* to Florida's interior-designer licensing requirement because it was such a "safety regulation"). While the requirement's "purpose to promote the public health or safety" does not "insulate" it from scrutiny entirely, it *does* mean that heightened scrutiny is off the table, and that this Court must instead ask whether the requirement is invalid under *Pike*. *Kassel*, 450 U.S. at 670-71.

## B. The Licensing Requirement Satisfies the *Pike* Balancing Test.

Under *Pike*, Plaintiffs face a doubly daunting burden. At root, *Pike* serves to "smoke out a hidden protectionism," which is why only a "small number" of cases have invalidated "genuinely nondiscriminatory laws" that nevertheless "impede[d] the flow of commerce" by burdening "instrumentalities of interstate transportation—trucks, trains, and the like." *NPPC*, 598 U.S. at 379 & n.2 (internal quotation marks and citation omitted). Of course, medical practitioners "are not trucks or trains," rendering Plaintiffs' claim against the nondiscriminatory licensing requirement "well outside *Pike*'s heartland." *Id.* at 379-80 & n.1. And Plaintiffs' "[in]auspicious start," *id.* at 380, is compounded by their challenging a quintessential "safety

16

regulation" that "thus carries a 'strong presumption of validity,'" *Locke*, 634 F.3d at 1194 (quoting *Kassel*, 450 U.S. at 670). After all, "incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978). Despite such incidental burdens, the dormant Commerce Clause was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens." *General Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997) (citation omitted).

With those principles favoring the State in mind, Plaintiffs come nowhere close to alleging that the telehealth-licensing requirement flunks *Pike*. Under that balancing test, a law that "regulates even-handedly to effectuate a legitimate local public interest" with "effects on interstate commerce [that] are only incidental" will "be upheld unless the burden imposed on such commerce is *clearly excessive* to the putative local benefits." 397 U.S. at 142 (emphasis added). First, the requirement is an evenhanded regulation: contrary to Plaintiffs' allegation that it "prohibit[s] out-of-state specialists" from treating New Jersey patients "via telemedicine," Compl. ¶ 74, by its plain terms (and as discussed above) it applies to *any practitioner* who seeks to treat New Jersey patients via telemedicine, even those practitioners who live in the State, *see supra* at 6-7, 12. Second, it effectuates a legitimate local public interest: the telehealth-licensing requirement operates exactly the same as the in-

17

person licensing requirement, *see supra* at 6-8, which has long been recognized as "assur[ing]" a practitioner's "qualifications of learning and skill" for the "protection of society," *Dent*, 129 U.S. at 122-23. Indeed, the Third Circuit has expressly deemed New Jersey's interest "in regulating the practice of medicine in its jurisdiction" as "*exceedingly strong*." *Zahl*, 282 F.3d at 211-12 (emphasis added). The nondiscriminatory nature of such a requirement and the health-and-safety interests it advances make it far afield of the "hidden protectionism" *Pike* seeks to "smoke out." *NPPC*, 598 U.S. at 379.

Third, Plaintiffs' allegations that the licensing burdens "for out-of-state specialists who only occasionally consult and follow-up with patients in New Jersey" are "prohibitive" or "substantial," Compl. ¶¶ 74-75, 82, are precisely the kind that the Third Circuit has already held to instead be "incidental." *Tolchin*, 111 F.3d at 1107-09. Although under New Jersey's in-state office requirement "[a]ll attorneys must incur some expense in order to comply," the *Tolchin* court explained that those disproportionately burdened by the requirement were attorneys "who wish to maintain small or sporadic practices in New Jersey." *Id.* at 1107. And the court described "those most burdened"—including attorneys "who occasionally practice in New Jersey as part of a larger practice based in another state"—as "not . . . a very large class." *Id.* at 1109. Just so here. While all practitioners (regardless of state citizenship) must bear the costs of getting licensed, those most burdened are the few

18

with "occasional[]" practices in New Jersey, whether in-person or remote. Such a burden, arising from the State's generally applicable licensing requirement "safeguard[ing] the health and safety of its people," is merely an "unavoidable" and "incidental" one. *City of Philadelphia*, 437 U.S. at 623-24.

Fourth, and finally, that incidental burden does not clearly exceed the telehealth-licensing requirement's benefits. The requirement need not be "the most narrowly tailored solution,"[7] instead, it need only be "rationally related" to the State's interest in promoting public health. *Tolchin*, 111 F.3d at 1108-09. It is: as with in-person licensing, "[d]ue consideration . . . for the protection of society may well induce the [S]tate to exclude from practice those who have not such a license." *Dent*, 129 U.S. at 123. Such a requirement ensures "a certain degree of skill and learning upon which the community may confidently rely." *Id.* at 122.[8] In all, it "generally burden[s] nonresident [practitioners] to the same degree that [it] burden[s] resident practitioners," and "[t]he fact that [it] may burden commerce in

---

[7] For this reason, Plaintiffs' allegations that New Jersey "relaxed" the telehealth-licensing requirement during the COVID-19 pandemic, Compl. ¶¶63-68, fail to move the needle.

[8] That is true even as applied to the Doctor Plaintiffs, who are already licensed in other states. Whether under the older reciprocal licensing program or the new Interstate Medical Licensure Compact, they must clear a background check and confirm that their existing licenses are "valid, current, and in good standing." N.J. Stat. Ann. § 45:1-7.5; *Id.* § 45:9-6.2. The State's health-and-safety interest lets it "ensur[e], at a minimum, that persons really are licensed and in good standing in another state." *Brokamp v. James*, 66 F.4th 374, 402 (2d Cir. 2023).

some incidental way is not enough to support [Plaintiffs'] claim." *Tolchin*, 111 F.3d at 1110. The "burden on interstate commerce does not *clearly* outweigh the benefit received from the [telehealth-licensing] requirement." *Id.* at 1109; *see also NPPC*, 598 U.S. at 390 (explaining that a dormant Commerce Clause violation must be "clear").

That conclusion is only bolstered by the State's "substantial"—and indeed exceedingly strong—interest in regulating the practice of medicine within its borders. *Tolchin*, 111 F.3d at 1110 (highlighting New Jersey's interest in "overseeing attorneys practicing within [its] borders"). While courts applying *Pike* generally "must not 'second guess the empirical judgment of lawmakers concerning the utility of legislation,'" *id.* at 1110-1111 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)); *NPPC*, 598 U.S. at 390, they are even more deferential in assessing health-and-safety regulations, which receive a "strong presumption of validity," *Kassel*, 450 U.S. at 670 (citation omitted). *See also Tracy*, 519 U.S. at 306 ("[Courts] have consistently recognized the legitimate state pursuit of such [health-and-safety] interests as compatible with the Commerce Clause."). This Court should thus "decline the invitation to second guess the legislature's judgment as to the relative importance of the safety justifications versus any burdens imposed on interstate commerce" and dismiss Plaintiffs' dormant Commerce Clause

claim. *Locke*, 634 F.3d at 1194-95 (upholding an interior-designer license requirement that did not discriminate against out-of-state residents).

## II.   THE LICENSING REQUIREMENT DOES NOT VIOLATE THE PRIVILEGES AND IMMUNITIES CLAUSE

The Doctor Plaintiffs' Privileges and Immunities claim fares no better. Under the Privileges and Immunities Clause, "[t]he citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. Const. art. IV, § 2. The Clause is designed to prevent "discrimination against out-of-state residents on matters of fundamental concern." *United Bldg. & Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden*, 465 U.S. 208, 220 (1984); *accord A.L. Blades & Sons, Inc. v. Yerusalim*, 121 F.3d 865, 869-71 (3d Cir. 1997). Acknowledging that "the pursuit of a common calling" such as the practice of medicine "is one of the most fundamental of those privileges protected by the Clause," *United Bldg.*, 465 U.S. at 219, the question becomes whether the telehealth-licensing requirement "discriminate[s] against nonresidents," and if it does, whether it "impos[es] too heavy a burden on the privileges of nonresidents" and "bear[s] a substantial relationship to the state's objective," *Castille*, 799 F.3d at 224 (citing *Tolchin*, 111 F.3d at 1113).

### A. The Licensing Requirement Is Neither Discriminatory Nor Protectionist

As with their dormant Commerce Clause claim, Plaintiffs falter out of the gate: the telehealth-licensing requirement does not discriminate against nonresident

practitioners at all, nor would any discrimination "abridge [their] ability to engage in a common calling in the sense prohibited by the Privileges and Immunities Clause." *McBurney v. Young*, 569 U.S. 221, 227 (2013). First, there is no facial or effective discrimination against nonresidents. *See supra* at 12-13. All practitioners, New Jersey residents and nonresidents alike, must be licensed to engage in telehealth, so the requirement "treats [New Jersey] residents no differently than out-of-state residents." *Castille*, 799 F.3d at 225. And while Plaintiffs allege a burden on "out-of-state specialists who only occasionally consult and follow-up with patients in New Jersey," Compl. ¶ 82, that burden equally affects New Jersey residents with such practices, meaning that "[a]ny incidental discrimination . . . is not based on residency status, but on the size and type of a[ provider's] practice," *Tolchin*, 111 F.3d at 1107-08, 1111-13 (a "requirement[] similarly affect[ing] residents and nonresidents" does not violate the Privileges and Immunities Clause). As the Tenth Circuit explained, the Clause does not "invalidate a generally applicable law" absent "a classification that creates a difference in status for residents and nonresidents." *Kleinsmith*, 571 F.3d at 1044-46 (similarly explaining that *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59 (2003), applies only when the "classification necessarily imposes discriminatory burdens on nonresidents"). Because any difference the licensing-requirement creates is "totally unconnected to residence," *id.* at 1046, Plaintiffs' claim necessarily "fails," *Castille*, 799 F.3d at 225.

Second, even if the requirement discriminated against out-of-state residents, it would still fall outside the Privileges and Immunities Clause's reach. In *McBurney*, the Supreme Court considered Virginia's Freedom of Information Act, which expressly allowed only Virginians to inspect and copy state public records. *See* 569 U.S. at 224-26. A nonresident who ran a business acquiring state real-estate tax records argued that the facially discriminatory law "abridge[d] his ability to earn a living in his chosen profession." *Id.* at 227. But while the Supreme Court acknowledged that the Privileges and Immunities Clause protected his right to "pursue a common calling," it held that the law did not violate that right "in the sense prohibited by the Privileges and Immunities Clause," because laws "violating the privilege of pursuing a common calling" are only those "enacted for the *protectionist purpose* of burdening out-of-state citizens." *Id.* (emphasis added). Virginia's law instead allowed its citizens to "obtain an accounting" of their public officials, a "distinctly nonprotectionist aim." *Id.* at 228; *accord Schoenefeld v. Schneiderman*, 821 F.3d 273, 286 (2d Cir. 2016) (New York law requiring nonresident attorneys to maintain a New York office was neither "enacted for [n]or serve[d] the protectionist purpose of favoring New York attorneys and disfavoring nonresident attorneys in practicing law in the state's courts").

So too here: despite Plaintiffs' conclusory allegation that the telehealth-licensing requirement "protect[s] in-state physicians from competing with out-of-

state specialists," Compl. ¶ 81, it instead serves the distinctly nonprotectionist aim of ensuring the health and safety of the State's citizens, *see supra* at 3-8, 16-18. Given that "the Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen," *McBurney*, 569 U.S. at 228-29, and here the incidental effect primarily burdens *occasional* practitioners (be they in-state or out-of-state), *see supra* at 13-14, 18-19, 22, the requirement patently does not serve to "provide a competitive economic advantage for [New Jersey] citizens," *McBurney*, 569 U.S. at 228. That reality separately sinks Plaintiffs' claim.

## B. The Requirement Is Substantially Related to Important Government Interests

Finally, *even if* the licensing requirement was somehow discriminatory against out-of-state residents, and *even if* that discrimination was somehow for an economically protectionist purpose, Plaintiffs *still* cannot allege that the requirement "impose[s] a disproportionately heavy burden on nonresidents" and "fail[s] to bear a substantial relationship to New Jersey's objective." *Tolchin*, 111 F.3d at 1113; *accord Castille*, 799 F.3d at 224. While the availability of "less restrictive means" is relevant to those questions, *Tolchin*, 111 F.3d at 1111, the requirement need not be the *least* restrictive means, because this "inquiry must . . . be conducted with due regard for the princip[le] that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer v. Witsell*, 334 U.S. 385, 397 (1948). That is especially true for health-and-safety issues, which are

"primarily and historically matters of local concern" that "States traditionally have had *great latitude* under their police powers to legislate [for]." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (cleaned up) (emphasis added).

The telehealth-licensing requirement comfortably clears this inquiry. In *Tolchin*, the monetary cost of maintaining a New Jersey office disproportionately burdened occasional practitioners, not nonresidents, and the time cost of attending in-person continuing legal education classes disproportionately burdened those further from the class-sites, not nonresidents. 111 F.3d at 1107-08, 1113 ("[A] New Jersey resident may need to travel farther and longer than someone in New York City to get to a course site."). And both requirements bore "a substantial relationship to New Jersey's goal of regulating the practice of law to the benefit of the public and are not overly restrictive of attorneys." *Id.* at 1113. This case is no different. While Plaintiffs quibble about the money and time it takes to get licensed in New Jersey, those costs are "disproportionately significant" for those practitioners with "national practices [who] only occasionally consult with or treat patients from New Jersey," Compl. ¶ 46, and such practitioners "may be New Jersey residents as well as nonresidents," *Tolchin*, 111 F.3d at 1107. So there is no disproportionately heavy burden on non-residents. And the licensing requirement is substantially related to the State's "exceedingly strong interest in regulating the practice of medicine in its jurisdiction," *Zahl*, 282 F.3d at 204, by "assur[ing]" that practitioners "possess[] the

requisite qualifications," *Dent*, 129 U.S. at 122-23. *Cf. Berch*, 773 F.3d at 1046 (Arizona's rule allowing attorneys admitted to practice in reciprocal states to be admitted in Arizona on motion was "closely related to advancing a substantial state interest" because Arizona "has a considerable interest in regulating its state bar and ensuring that attorneys licensed in Arizona will be treated equally in states having reciprocity with Arizona").

At bottom, because the telehealth-licensing requirement falls well within the New Jersey's classic power to promote its citizens' health and safety, it is worthy of the "considerable leeway" given the State to address "local" matters, *Toomer*, 334 U.S. at 397. That is yet another reason why Plaintiffs' Privileges and Immunities claim fails.

## III. THE LICENSING REQUIREMENT DOES NOT VIOLATE THE FIRST AMENDMENT.

Plaintiffs' next claim—that the telehealth-licensing requirement violates their First Amendment right to free speech—is equally meritless. Under the First Amendment, which applies to the State via the Fourteenth Amendment, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), the requirement may not "abridg[e] the freedom of speech," U.S. Const. Amend. I. But because it is "a content-neutral licensing requirement for the practice of [medicine], it is valid under the First Amendment if it has a rational connection with the [providers'] fitness or capacity to practice the profession." *Castille*, 799 F.3d at 221. It does. And even if the

requirement were seen as a "regulation[] of professional conduct that incidentally burden[s] speech," *Nat'l Inst. Of Fam. & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 769 (2018), and subject to intermediate scrutiny, it would easily pass that bar. It directly advances the State's exceedingly important interest in protecting its citizens' health-and-safety and is sufficiently drawn to serve that interest. *See id.* at 773.

### A. The Licensing Requirement Is Content-Neutral And Requires Only Rational Basis.

As the Third Circuit has already held, content-neutral professional licensing requirements are subject to rational-basis review. *Castille*, 799 F.3d at 220-23. In *Castille*, Pennsylvania's rule allowing attorneys barred in reciprocal states to be admitted by motion, without taking the state's bar examination, was challenged by attorneys barred in non-reciprocal states as "constitut[ing] content and viewpoint discrimination . . . subject to strict scrutiny." *Id.* at 220. The *Castille* court rejected that characterization of the rule, explaining that it did not "pass judgment on the content of any speech," instead serving as an "exercise of Pennsylvania's 'broad power to establish standards for licensing practitioners and regulating the practice of professions.'" *Id.* at 221 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975)). And "[b]ecause it regulate[d] only the requirements for *obtaining* a license to practice law and d[id] not 'restrict what a professional can and cannot say,'" *id.* (quoting *King v. Governor*

27

*of New Jersey*, 767 F.3d 216, 229 (3d Cir. 2014)), it was a "content-neutral licensing requirement for the practice of law" that was "valid under the First Amendment if it has a rational connection with the applicant's fitness or capacity to practice the profession," *id.*

New Jersey's medical licensing requirement fits the bill. It is a licensing requirement for the practice of medicine that is content-neutral: it "places no limits or conditions on what a licensed [practitioner] may hear and say in providing [care]," and does "not depend on anything that is said between a [practitioner] and a client seeking . . . care." *Brokamp v. James*, 66 F.4th 374, 394 (2d Cir. 2023) (deeming as content-neutral New York's streamlined licensing requirements for mental-health counselors already licensed in other states). Put differently, it "does not dictate what can be said between a [practitioner] and client; it merely determines who is qualified as a [practicing] professional." *Id.*

Plaintiffs' contention that the licensing requirement is content-based merely "because it requires government officials to thoroughly review the content of a conversation with a patient to determine whether the conversation was made for the purpose of providing or supporting a health care service," Compl. ¶ 95, is foreclosed by *City of Austin v. Reagan National Advertising of Austin*, 596 U.S. 61, 72-74 (2022). There, the Supreme Court reiterated "that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *Id.*; *see also*

*Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 148-49 (3d Cir. 2022) (recognizing that the Court "expressly rejected [Plaintiffs'] argument"). Restrictions requiring some examination of speech are content-focused only if they "discriminate based on 'the topic discussed or the idea or message expressed,'" *City of Austin*, 596 U.S. at 73-74 (quoting *Reed*, 576 U.S. at 171)—and New Jersey simply "does not condition its [telehealth-]licensing requirement on the topics or subject matters discussed," *Brokamp*, 66 F.4th at 397.[9]

Because the State "regulates only the requirements for *obtaining* a license to practice [medicine] and does not restrict what a professional can and cannot say," the licensing requirement is subject only to rational-basis review. *Castille*, 799 F.3d at 221. That sets it apart from cases like *NIFLA*, which confirmed post-*Castille* that *content-based* restrictions are not subject to lesser scrutiny merely because the speech restricted "is uttered by 'professionals.'" *NIFLA*, 585 U.S. at 767. While *NIFLA* abrogated prior precedent like *King*, 767 F.3d at 236, which had "except[ed] professional speech from the rule that content-based regulations of speech are subject to strict scrutiny," *NIFLA*, 585 U.S. at 767, the Supreme Court nonetheless

---

[9] Nor does Plaintiffs' allegation that the requirement is "a speaker-based restriction" alter this reality. Compl. ¶ 96. The Supreme Court "has treated identity-based distinctions as part of the inquiry into content-neutrality, not as a separate reason for finding a statute unconstitutional," meaning that labeling the requirement as a speaker-based restriction "doesn't change [the] analysis." *Capital Associated Indus. v. Stein*, 922 F.3d 198, 209 n.4 (4th Cir. 2019); *see also Castille*, 799 F.3d at 222-23 (similarly treating an allegation of "[s]peaker-partial laws").

emphasized that when content-based restrictions do not exist, professional speech enjoys "less protection," including when states "regulate professional conduct, even though that conduct incidentally involves speech," *id.* at 768; *see also id.* at 769-70 (fleshing out this exception). Since New Jersey's requirement that physicians must be licensed in the State to deliver medical services to in-State patients decidedly does not "compel[] individuals to speak a particular message" or "alter the content of their speech," *NIFLA* does not bear on the test here. *Id.* at 766 (citation omitted).[10]

In short, *Castille* remains good law and binds this Court to apply rational-basis review. Unlike in *King*, the *Castille* court specifically held that the rule at issue was "*not* a prohibition or other restriction on professional speech." 799 F.3d at 221 (emphasis added); *see also, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1072-76 (9th Cir. 2022) (explaining that *NIFLA* abrogated only the categorically weaker protection given to professional speech); *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1219-25 (11th Cir. 2022) (same). True, in *NIFLA*'s wake, some

---

[10] Plaintiffs cannot argue that the licensing requirement, even as applied, principally regulates speech: as they themselves allege, telehealth lets the doctors "communicate quickly and efficiently" in reviewing patients' "*scans*." Compl. ¶ 59 (emphasis added). After all, licensing laws "inevitably have some effect on the speech of those who are not . . . licensed," which "is merely incidental to the primary objective of regulating the conduct of the profession." *Capital Associated Indus.*, 922 F.3d at 208. But even "assum[ing] . . . that [telehealth] services consist only of speech without any non-verbal conduct," the requirement "is content-neutral, and, therefore, subject to intermediate rather than strict scrutiny." *Brokamp*, 66 F.4th at 392; *see also supra* at 27-29.

appellate courts have deemed professional licensing requirements as regulations incidentally affecting speech, subject to intermediate scrutiny. *See, e.g.*, *Capital Associated Indus. v. Stein*, 922 F.3d 198, 207-09 (4th Cir. 2019); *Gray v. Dep't of Public Safety*, 248 A.3d 212, 219-22 (Me. 2021). But the Third Circuit has already determined that rational-basis review applies to content-neutral professional licensing requirements that only incidentally burden speech.

## B. Under Either Rational Basis Or Intermediate Scrutiny, The Licensing Requirement Survives.

Applying *Castille* to the telehealth-licensing requirement resolves this case because the law sounds in rational basis—a test that affords the law "a strong presumption of validity" where Plaintiffs must "negat[e] every conceivable basis which might support it." *F.C.C. v. Beach Comm'cns, Inc.*, 508 U.S. 307, 314-15 (1993) (internal quotation marks and citation omitted). As discussed at length previously, *see supra* at 19-21, the licensing requirement "has a rational connection with the applicant's fitness or capacity to practice the profession," *Castille*, 799 F.3d at 221, by "assur[ing]" a practitioner's "qualifications," *Dent*, 129 U.S. at 122-23. Notwithstanding Plaintiffs' "arguments as to the virtues of the [telehealth-licensing requirement]," the requirement "easily passes" rational-basis scrutiny. *Castille*, 799 F.3d at 221-22; *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (emphasizing that courts "hardly ever" strike down legislation as irrational). The Court need go no further to uphold the statute.

But even under intermediate scrutiny—which, again, is foreclosed by *Castille*—the telehealth-licensing requirement easily makes the grade. Under intermediate scrutiny, a state interest must be "substantial" and the challenged law must be "sufficiently drawn to achieve it." *NIFLA*, 585 U.S. at 773; *see also Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2019) (law must be "narrowly tailored to serve a significant interest" (quoting *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)). As discussed, the State's interest in "regulating the practice of medicine in its jurisdiction" is not only substantial or significant but "*exceedingly strong*." *Zahl*, 282 F.3d at 211 (emphasis added). The question then is whether the telehealth-licensing requirement is sufficiently drawn to achieve that compelling interest. A sufficiently tailored law "need not be the least restrictive or least intrusive means," but merely "must not burden substantially more speech than is necessary to further" the State's interests. *McCullen*, 573 U.S. at 486; *see also Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "a fit that is not necessarily perfect, but reasonable"). As an exercise of the State's longstanding practice assuring practitioners' qualifications, the telehealth-licensing requirement is not unduly burdensome.

The Second Circuit's decision in *Brokamp* shows why the telehealth-licensing requirement is suitably tailored. There, a mental-health counselor licensed in Virginia challenged New York's own licensing law—which required already

32

licensed counselors to pay a $371 fee and meet a variety of "streamlined" standards confirming their qualifications—as violating the First Amendment. *See* 66 F.4th at 381-85 & n.10. After holding that New York's licensing requirement was content neutral, *id.* at 392-97, the *Brokamp* court emphasized that the requirement "addresse[d] a significant state interest in safeguarding and promoting public health," and did so "in a way—licensure based on specified standards of education, experience, and testing—long recognized by the Supreme Court directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive health care providers," *id.* at 399 (citing *Dent*, 129 U.S. 114, 122-23). And in assessing tailoring, it rejected the plaintiff's argument that she "pose[d] no threat to public health" because of her "Virginia license, extensive education and experience, and satisfactory unlicensed counseling in New York during the pandemic." *Id.* at 401. That argument, the court explained, fell "short because New York's interest in protecting its residents from incompetent or deceptive counselors warrants the state ensuring, at a minimum, that persons *really are* licensed and in good standing in another state before exempting them from the state's initial license requirement." *Id.* at 402 (emphasis added). The Second Circuit held that "requiring a showing that the out-of-state license was obtained by satisfying educational, experiential, and testing requirements comparable to New York's is sufficiently tailored to the state's public health interest to avoid unduly burdening First Amendment rights." *Id.* And while

the $371 licensing fee was higher than that of initial licensure, there was no "alleg[ation] that this fee [wa]s unreasonable to cover administrative costs in connection with confirming that a person seeking license by [the streamlined process] holds an out-of-state license, obtained that license by satisfying requirements comparable to New York's, and is in good standing." *Id.* at 402-403. At bottom, the streamlined licensing requirement "survive[d] intermediate scrutiny both on its face and as applied." *Id.* at 403.

*Brokamp* compels the same conclusion here. While Drs. MacDonald and Gardner are certainly well-accomplished, New Jersey's "interest in protecting its residents from incompetent or deceptive [practitioners]" means that, at "minimum," the State can "ensure . . . that [they] *really are* licensed and in good standing" in Massachusetts and Pennsylvania, respectively. *Id.* at 402. And while Plaintiffs allege that the New Jersey licensing requirements "mirror, in all material respects, the requirements for licensure in Massachusetts and Pennsylvania," Compl. ¶ 84, it is the State's prerogative to confirm that their licenses were "obtained by satisfying educational, experiential, and testing requirements comparable to [New Jersey's]," rather than taking applicants at their word alone. *Brokamp*, 66 F.4th at 402; *see also* N.J. Stat. Ann. § 45:1-7.5 (requiring that an out-of-state license be obtained pursuant

to "substantially equivalent" standards as New Jersey's).[11] "Indeed, it appears that [they] can easily make this showing such that it is not seriously burdensome as applied to [them]." *Brokamp*, 66 F.4th at 402. And, unlike in *Brokamp*, the licensing fees are the same for both initial and currently licensed applicants, *see supra* at 4-5, strongly indicating that the fee is no higher than necessary to confirm that Plaintiffs indeed hold comparable licenses and remain in good standing, *see* 66 F.4th at 402-03.

Nor do Plaintiffs' allegations that New Jersey "relaxed" the telehealth-licensing requirements during the COVID-19 pandemic—including waiving the fees and quickening the application timeline, Compl. ¶¶ 63-68—change the outcome. The Second Circuit rejected that very argument in *Brokamp*. 66 F.4th at 382, 401. After all, the licensing requirement "need not be the least restrictive or least intrusive means of serving the government's interests," *McCullen*, 573 U.S. at 486, and it is wholly "reasonable" that the State chose to shift the burdens of licensing somewhat during the acute stages of a once-in-a-lifetime global pandemic, *see Capital*

---

[11] That is especially true where, as with the practice of law, "[s]ince the founding of the Republic, the licensing and regulation of [medical practitioners] has been left exclusively to the States and the District of Columbia within their respective jurisdictions." *Leis v. Flynt*, 439 U.S. 438, 442 (1979); *accord Watson v. State of Maryland*, 218 U.S. 173, 176 (1910). Given that the "States prescribe the[ir own] qualifications for admission to practice" medicine, it follows that "the Constitution does not require that because a [provider] has been admitted to [practice in] one State, he or she must be allowed to practice in another." *Leis*, 439 U.S. at 442-43.

*Associated Indus.*, 922 F.3d at 209-10 (requiring only "a reasonable fit" even though "[a]nother state legislature might balance the interests differently"); *cf. Brokamp*, 66 F.4th at 400-01 (explaining that New York could exempt friends, teachers, and religious mentors from getting licensed because the state "could reasonably conclude that the benefits of such interactions sufficiently outweigh the risks to public health as to be excused from license requirements").

Ultimately, as applied to Plaintiffs, the telehealth-licensing requirement "does not burden more speech than necessary to allow the [S]tate to protect residents against incompetent and deceptive [practitioners]." *Brokamp*, 66 F.4th at 402; *see also Capital Associated Industries*, 922 F.3d at 207-10 (upholding under intermediate scrutiny a state law forbidding corporations from practicing law); *Gray*, 248 A.3d at 218-23 (upholding under intermediate scrutiny application of private-investigation licensing standards). Because the telehealth-licensing requirement "survives intermediate scrutiny both on its face and as applied, [Plaintiffs] fail[] to state a First Amendment claim for which relief can be granted." *Brokamp*, 66 F.4th at 403.

## IV.   THE LICENSING REQUIREMENT DOES NOT VIOLATE THE FOURTEENTH AMENDMENT.

Plaintiffs' final claim—that the telehealth-licensing requirement violates Mr. Abell's Fourteenth Amendment due-process right to "direct the care, custody, and control" of his child, J.A., Compl. ¶¶ 101-09—fails as well. Although that right has

long been recognized, *see Troxel v. Granville*, 530 U.S. 57, 65-66 (2000), the Third Circuit has expressly held that it does *not* extend to parents' choice of their child's particular treatment or health-care provider, *see Sammon v. N.J. Bd. of Med. Examiners*, 66 F.3d 639, 644-47 (3d Cir. 1995); *Doe v. Governor of N.J.*, 783 F.3d 150, 156 (3d Cir. 2015). That holding extinguishes Mr. Abell's due-process claim.

*Sammon* and *Doe* are instructive. In *Sammon*, expecting parents seeking care from an experienced but unlicensed midwife challenged New Jersey's midwifery-licensing requirement as violating their substantive due process rights. *Sammon*, 66 F.3d at 641. The *Sammon* court identified the parents' interest as that of "selecting a midwife of their choice" and explained that because "state restrictions on a patient's choice of particular health care providers" do not burden "fundamental" rights, neither did the parents have a "constitutional right to their choice of a health care provider who does not meet quality control standards that a legislator might reasonably conceive to be desirable." *Id.* at 645, 647. The Third Circuit reinforced that holding in *Doe*, when it explained that the parental-rights case law "does not support the extension of th[e] right [to care, custody, and control] to a right of parents to demand that the State make available a particular form of treatment." 783 F.3d at 156. It agreed, as in *Sammon*, that patients themselves have no fundamental right to choose specific treatments or providers, so "the fundamental rights of parents do not

include the right to choose a specific type of provider for a specific medical . . . treatment that the state has reasonably deemed harmful." *Id.* (citation omitted).

Because the telehealth-licensing requirement does not implicate a fundamental right, it is subject to rational-basis review, *Sammon*, 66 F.3d at 645-47, which it categorically satisfies, *see supra* at 19-21. "Assuring that [practitioners] are qualified . . . is rationally related to the state's valid interest in the health and safety of" its citizens. *Sammon*, 66 F.3d at 646 (citing *Dent*, 129 U.S. 114). In the end, as with Plaintiffs' other claims, "[t]his controversy is one this [C]ourt is not authorized to resolve and the [P]laintiffs must take their evidence and advocacy to the halls of the New Jersey[] legislature." *Id.* at 647.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Christopher J. Ioannou
      Christopher J. Ioannou
      Deputy Attorney General

Dated: April 12, 2024