## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SHANNON MACDONALD, *et al.*,** | **Case No. 23–cv–23044–ESK–EAP** |
| **Plaintiffs,** | |
| **v.** | |
| **OTTO F. SABANDO,** | **OPINION** |
| **Defendant.** | |

**KIEL, U.S.D.J.**

**THIS MATTER** is before the Court on defendant Otto F. Sabando's motion to dismiss. (ECF No. 23.)  For the following reasons, the motion will be GRANTED.

### I.    BACKGROUND

#### A.    <u>Telemedicine in New Jersey</u>

Pursuant to N.J. Stat. Ann. §(Section) 45:1–62(b), any healthcare provider who utilizes telemedicine or engages in telehealth must be licensed, certified, or registered to provide such services in New Jersey.  N.J. Stat. Ann. §45:1–62(b).[1]  Providers are further subject to state regulation and jurisdiction and

---

[1] Those who hold a valid, current license in good standing in another state may obtain reciprocal licensure in New Jersey following the New Jersey State Board of Medical Examiners' (the Board) receipt of a completed application, application fee, consent to a criminal background check, and fee for such background check.  *See* N.J. Admin. Code §13:35–3.2(a).  This is so long as the Board determines that the licensing state has or had at the time of issuance substantially equivalent educational, training, and examination requirements as New Jersey, the applicant has been practicing for at least two years in the five years prior to their application, and additional requirements are met.  *Id.*  Such additional requirements consist of documentation indicating that the applicant's license is in good standing, the applicant's criminal background check does not disclose a conviction of a disqualifying crime, and designation of an agent in New Jersey for service of process "if the applicant is not a New Jersey resident and

must comply with liability-insurance requirements. *Id.* Telehealth refers to "the use of information and communications technologies, including telephones, remote patient monitoring devices, or other electronic means, to support clinical health care, provider consultation, patient and professional health-related education, public health, health administration, and other services in accordance with" Section 45:1–61 et al. N.J. Stat. Ann. §45:1–61. Telemedicine refers to "the delivery of a health care service using electronic communications, information technology, or other electronic or technological means to bridge the gap between a health care provider who is located at a distant site and a patient who is located at an originating site …." *Id.*[2]

The unlicensed practice of medicine is a crime of the third degree. N.J. Stat. Ann. §2C:21–20. Unlicensed practice is also subject to civil penalties of up to $10,000 for the first violation and up to $20,000 for each subsequent violation. N.J. Stat. Ann. §45:1–25. At issue in this case is the effect of Section 45:1–62(b)'s licensure requirement on out-of-state specialists.

### B.    The Complaint

Plaintiff Shannon MacDonald, M.D. is a resident of Massachusetts and a board-certified radiation oncologist at Massachusetts General Hospital in Boston. (Compl. p.5.) Plaintiff Paul Gardner, M.D. is a resident of Pennsylvania and the neurosurgical director of the Center for Cranial Base Surgery at the University of Pittsburgh Medical Center. (*Id.*) Defendant Otto F. Sabando was the president of the Board, which is responsible for

———————————

does not have an office in New Jersey." *Id.* §13:35–3.2(b). Therefore, and relevant to my analysis below, New Jersey law contemplates nonresidents obtaining licensure.

[2] The complaint uses the term "telemedicine" to refer to both telemedicine and telehealth. (ECF No. 1 (Compl.) p.7 n.1.) Similarly, defendant uses the terms interchangeably unless otherwise specified in the moving brief. (ECF No. 23–1 (Def.'s Mot. Br.) p.14 n.2.) I adopt a similar convention and will use "telemedicine" to refer to both terms except where otherwise noted.

medical licensure and regulation in New Jersey. (*Id.* p. 6.)[3] He was sued in his official capacity. (*Id.*)

When plaintiff J.A. was 18 months old, he was diagnosed with pineoblastoma and his father, plaintiff Michael Abell, called pediatric oncologists across the country to gauge J.A.'s treatment options. (*Id.* p. 11.) Multiple rounds of chemotherapy and two surgeries were unsuccessful and J.A.'s doctors referred him to Dr. MacDonald. (*Id.* pp. 11, 12.) After Dr. MacDonald reviewed J.A.'s records remotely and consulted with J.A.'s family via telemedicine, J.A.'s family traveled to Boston for successful proton therapy. (*Id.* p. 12.) J.A., now a teenager residing in New Jersey, must undergo annual scans for the rest of his life and he and his family will need the use of telemedicine to consult with Dr. MacDonald. (*Id.*)

Similarly, plaintiff Hank Jennings was 19 years old when he was diagnosed with a rare tumor at the base of his skull and he and his family consulted with several out-of-state specialists using telemedicine. (*Id.* p. 13.) Jennings and his mother eventually relocated to Pittsburgh for him to undergo four surgeries and receive in-patient rehabilitation. (*Id.*) Though his treatment was successful, Jennings must periodically follow-up with Dr. Gardner[4] and would need to travel to Pittsburgh if not for telemedicine, which allows him to follow-up with Dr. Gardner remotely from his dormitory or home in New Jersey. (*Id.* p. 14.)

---

[3] Plaintiffs note that Sabando was replaced by S. Chetan Shah after this case commenced and that Shah is automatically substituted pursuant to Federal Rule of Civil Procedure 25(d). (ECF No. 32 (Pls.' Apr. 8, 2025 Notice) p. 1 n. 1.) In any case, I simply refer to the movant as "defendant" here.

[4] Defendant asserts that it is unclear from the complaint whether Dr. Gardner treats Jennings. (Def.'s Mot. Br. p. 17.) I agree that plaintiffs do not expressly state so but read the complaint as indicating that Jennings is Dr. Gardner's patient.

Plaintiffs explain that when a patient is referred to a specialist such as Drs. MacDonald or Gardner, it is often because their local physician lacks the expertise, experience, or resources to diagnose or treat their unique condition. (*Id.* p. 9.)  After a referral is made to such a specialist, the specialist consults with the patient to confirm the diagnosis and determine whether the specialist can treat them.  (*Id.*)  New Jersey's restrictions on telemedicine mean that patients seeking to consult with Drs. MacDonald or Gardner must decide whether to incur the cost of traveling to discuss potential treatment, a cost that is exacerbated when young patients must be accompanied by their parent or guardian.  (*Id.*)  Some patients are unable or elect not to travel and thus do not receive life-saving treatment from a specialist.  (*Id.* pp. 9, 10.)  Patients who ultimately receive out-of-state treatment may still require follow-up care and telemedicine may be used to monitor a patient's progress without the need to travel.  (*Id.* p. 10.)  A patient may obtain a blood test, imaging, or the like at a local facility and have the corresponding data interpreted via telemedicine by an out-of-state specialist.  (*Id.* pp. 10, 11.)

New Jersey's licensure requirement burdens specialists, according to plaintiffs.  (*Id.* pp. 14–17.)  Initial licensure costs $550; requires a background check, fingerprinting, significant documentation, and related costs; and takes an average of three months to process.  (*Id.* p. 14.)  The Interstate Medical Licensure Compact is intended to streamline the process but still requires $700 for participation, state fees, fingerprinting, and background checks and takes weeks to process.  (*Id.* p. 15.)  Maintaining licenses in multiple states is burdensome for Drs. MacDonald and Gardner, including applicable fees, monitoring renewal dates, and complying with state-specific requirements. (*Id.*)  Such costs are disproportionately significant for specialists such as Drs. MacDonald and Gardner who have national practices and only occasionally consult with or treat New Jersey patients.  (*Id.*)  Specialists with national

practices also do not know in advance where a patient may come from, meaning that they would be precluded from consulting with or treating a patient if they are required to first obtain a license. (*Id.* p. 16.)

Without New Jersey licenses, Drs. MacDonald and Gardner must decide whether to risk criminal and civil liability for using telemedicine to converse with New Jersey patients, any enforcement for which could also lead to penalties in the states in which they are licensed. (*Id.*) The inability to use telemedicine to consult with potential New Jersey patients or follow-up with existing New Jersey patients will result in specialists with national practices consulting with and treating fewer patients. (*Id.* p. 17.)

Licensure requirements also burden patients, according to plaintiffs. (*Id.* pp. 18–20.) Without convenient access to out-of-state specialists, patients such as J.A. and Jennings may only avail themselves of local expertise and resources, which may be insufficient. (*Id.* p. 18.) During the critical days following diagnosis, telemedicine allows patients to consult with specialists to gather opinions and options no matter their location or budget. (*Id.*) The time and cost associated with physically traveling to each specialist would preclude many patients from obtaining care and some patients' conditions may not permit them to travel even if they have the financial means. (*Id.* p. 19.) Similar barriers apply to patients who have been treated by an out-of-state specialist but now require follow-up care. (*Id.*)

New Jersey's licensure requirement was relaxed during the COVID-19 pandemic, during which a physician could engage in telemedicine with their pre-existing patient without obtaining a New Jersey license. (*Id.* p. 20.) A physician without a New Jersey license could use telemedicine to screen for, diagnose, and treat COVID-19 via telemedicine regardless of whether they possessed a pre-existing relationship with the patient. (*Id.*) The Board further implemented an emergency reciprocity program that waived

application fees and enabled licensure within 24 hours.    (*Id.*)    That program expired on March 31, 2023.    (*Id.* pp. 20, 21.)

Plaintiffs assert four counts.  (*Id.* pp. 21–30.)  Count 1 alleges that Section 45:1–62(b)'s licensure requirement restricts and burdens the practice of medicine across state lines by prohibiting out-of-state specialists from consulting and following-up with New Jersey patients via telemedicine in violation of the dormant Commerce Clause.  (*Id.* pp. 21–23.)  Count 2 claims that Section 45:1–62(b) violates the Privileges and Immunities Clause by prohibiting out-of-state specialists from practicing across state lines using telemedicine.  (*Id.* pp. 23–25.)  The burdens of obtaining and maintaining New Jersey licensure are prohibitive for out-of-state specialists, according to plaintiffs, and the requirements for New Jersey licensure mirror those in Massachusetts and Pennsylvania in all material respects.  (*Id.* pp. 24, 25.)  No known harms occurred during New Jersey's pandemic-era relaxation of licensure rules.  (*Id.* p. 24.)

Count 3 is premised on plaintiffs' First Amendment rights to engage in speech and alleges that Section 45:1–62(b) restricts Drs. MacDonald and Gardner's ability to speak with potential patients and Jennings, J.A., and Abell's ability to share and receive information with specialists.  (*Id.* pp. 25–28.)  Plaintiffs contend that Section 45:1–62(b) is both content-based—because it requires government officials to review the content of a physician's conversation with a patient to determine whether it was made for the purpose of providing or supporting healthcare—and speaker-based because restrictions apply based on licensure.  (*Id.* p. 27.)  Finally, Count 4 alleges that Section 45:1–62(b) prevents Abell from seeking lawful medical care for his son, in violation of his due process right to the care, custody, and control of his child. (*Id.* pp. 29, 30.)

Plaintiffs seek declarations that Section 45:1–62(b) violates the dormant Commerce Clause, Privileges and Immunities Clause, and First and Fourteenth Amendments as applied to plaintiffs, permanent injunctive relief restraining enforcement of Section 45:1–62(b) against plaintiffs, and attorney's fees and costs.  (*Id.* pp. 30, 31.)

The parties submitted pre-motion letters to District Judge Georgette Castner. (ECF Nos. 18, 19.) Judge Castner waived her pre-motion conference requirement and directed defendant to answer, move, or otherwise respond to the complaint.  (ECF No. 20.)  Following Judge Castner's order, but before the pending motion practice ensued, this case was reassigned to me. (ECF No. 21.)

## II.   MOTIONS TO DISMISS

Prior to the filing of a responsive pleading, a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).   To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" *Doe v. Princeton Univ.*, 30 F.4th 335, 341 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)), and—accepting the plaintiff's factual assertions, but not legal conclusions, as true—"'plausibly suggest[]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *id.* at 342 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   Courts further evaluate the sufficiency of a complaint by "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."   *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

### III.  DISCUSSION

#### A.    Count 1 – Dormant Commerce Clause

Congress has the power to "regulate Commerce ... among the several States" pursuant to the Commerce Clause of the United States Constitution. *See* U.S. Const. art. I, §8, cl.3.   This positive grant of power "also contains 'an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce,' often called the 'dormant' Commerce Clause." *Mech. Contractors Ass'n of N.J., Inc. v. New Jersey*, 541 F. Supp. 3d 477, 494 (D.N.J. 2021) (quoting *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652 (1981)).   The dormant Commerce Clause prohibits economic protectionism, which benefits in-state economic interests by burdening out-of-state competition.   *Id.*

Courts first determine whether the challenged measure discriminates against interstate commerce in either purpose or effect.  *See Heffner v. Murphy*, 745 F.3d 56, 70 (3d Cir. 2014).   If so, heightened scrutiny applies and the state must "demonstrate (1) that the statute serves a legitimate local interest, and (2) that this purpose could not be served as well by available nondiscriminatory means."  *Id.* (quotations omitted) (quoting *Freeman v. Corzine*, 629 F.3d 146, 158 (3d Cir. 2010)). If heightened scrutiny is inappropriate, courts apply the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Id.*   The *Pike* inquiry asks "whether the [law's] burdens on interstate commerce substantially outweigh the putative local benefits."  *Id.* at 71 (quotations omitted) (alteration in original) (quoting *Freeman*, 629 F.3d at 158).

Defendant contends that heightened scrutiny is inappropriate because Section 45:1–62(b)'s licensure requirement does not discriminate against out-of-state practitioners but rather evenhandedly applies to all physicians. (Def.'s Mot. Br. pp.20, 21.)   Section 45:1–62(b) satisfies the *Pike* standard,

according to defendant, because it applies to all telemedicine practitioners, effectuates a legitimate local public interest in ensuring practitioners' qualifications, and any incidental burdens on interstate commerce do not clearly exceed the licensure requirement's benefits.  (*Id.* pp. 24–29.)

Not surprisingly, plaintiffs argue that Section 45:1–62(b) burdens interstate commerce.   They liken this case to *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) in that the licensure requirement discriminates against the provision of medical services across state lines, imposes costs that physicians located and practicing solely in New Jersey do not bear, and removes any advantages associated with having a national, specialized practice in a single location.   (ECF No. 26 (Pls.' Opp'n Br.) pp. 10–12.)   The effect will be that out-of-state specialists will cease advising New Jersey patients, leading patients to seek care from local physicians who do not have necessary experience or expertise, travel out of state to seek care, or forego care.   (*Id.* p. 12.)   Plaintiffs liken residency to state of licensure and challenge the licensure requirement only insofar as it applies to advice and follow-ups, which they distinguish from direct treatment which they claim only takes place in the state of licensure.   (*Id.* pp. 13, 14.)   The time, expense, and ongoing compliance associated with New Jersey licensure does not impact New Jersey physicians who only treat and speak with New Jersey patients in the same way as they do out-of-state physicians.   (*Id.* p. 14.)   Section 45:1–62(b) excludes out-of-state physicians who have no need for a New Jersey medical license because they do not provide treatment in New Jersey, according to plaintiffs. (*Id.* p. 15.)   Further, given the relaxation of licensure rules during the pandemic, economic protectionism is a better explanation for Section 45:1–62(b) than safety.   (*Id.* p. 16.)

Plaintiffs frame defendant's local interest as prohibiting specialized national experts in order to protect society.   (*Id.* p. 17.)   Such an interest fails

9

under *Pike* because 1) Drs. MacDonald and Gardner do not provide or seek to provide treatment in New Jersey, 2) the licensure requirement harms patients who do not have access to specialized care, and 3) New Jersey's pandemic-era relaxation of requirements did not harm New Jerseyans.   (*Id.* pp. 17, 18.)   The most plausible explanation for licensure in this narrow case is to protect in-state physicians from competition and, even if such an interest was permissible, the need for patients to consult with specialists is precisely because there are no physicians in New Jersey qualified to provide the same advice.   (*Id.* p. 18.) In any event, Section 45:1–62(b)'s burdens are clearly excessive given the minimal interest served by the requirement and the substantial as-applied burdens to Drs. MacDonald and Gardner—for whom the expense and administrative burdens to maintain licensure in every state in which they engage in telemedicine would be prohibitive.   (*Id.* p. 19.)   Licensure also burdens patients as it operates to prohibit consultation with specialists absent out-of-state travel.   (*Id.* p. 20.)   Plaintiffs suggest various alternative schemes including pandemic-era practices and the creation of an out-of-state-physician registry as adopted by other states.   (*Id.* p. 21.)

## 1.    <u>Discrimination Against Interstate Commerce</u>

At the outset, I agree with defendant that plaintiffs "muddy the waters" by seeking to differentiate treatment of a patient with the activities that they wish to engage in, namely consultation with potential patients and follow-up care with existing patients.   (ECF No. 29 (Def.'s Reply Br.) pp. 8, 9.)   However Drs. MacDonald and Gardner define "treatment" in their own practices, New Jersey law unambiguously includes "provider consultation" in its definition of "Telehealth."   N.J. Stat. Ann. § 45:1–61.   "Telemedicine" also broadly refers to "the delivery of a health care service using electronic communications, information technology, or other electronic or technological means to bridge the

gap between a health care provider who is located at a distant site and a patient who is located at an originating site …."  *Id.*  As such, I will not differentiate consultations and follow-ups from other forms of treatment.

I am further unpersuaded by plaintiffs' citation of *Hunt*.  *Hunt* pertained to a North Carolina law requiring all closed containers of apples to display either the applicable United States Department of Agriculture (USDA) grade or none at all, with state grades expressly prohibited.  432 U.S. 337.  Due to the importance of apple production in the state, Washington had established a mandatory inspection program and corresponding quality standards and grades that were equivalent or superior to those adopted by the USDA.  *Id.* at 336.  The North Carolina scheme required Washington apple growers to destroy pre-printed labels on containers shipped to North Carolina, repackage apples shipped to North Carolina, or discontinue their pre-printed label practice.  *Id.* at 338.  The Court concluded that the practical effects of the North Carolina statute both burdened sales of Washington apples and discriminated against them, most obviously by raising the cost of doing business in North Carolina while leaving North Carolina growers unaffected.  *Id.* at 350–51.  The statute further removed the competitive and economic advantage Washington had earned through its inspection and grading system, which had gained nationwide acceptance.  *Id.* at 351.  In the free market, Washington sellers would enjoy an advantage in situations in which Washington grades were superior and the inferior USDA grading offered North Carolina sellers protection against out-of-state competition.  *Id.* at 351–52.

Analogizing *Hunt* to the case at bar, presumably for the intended purpose of mirroring the purported superiority and related advantages of Drs. MacDonald and Gardner's services as compared to New Jersey physicians, is interesting even without a comparable objective inspection and grading scheme for physicians.  However, at the risk of reciting a predictable idiom, I find that

plaintiffs are comparing apples with oranges.  The question here is whether the licensure requirement falls equally on New Jersey and out-of-state physicians.  *See Heffner*, 745 F.3d at 72.  It unquestionably does.

*Heffner* is instructive.  There, various challenges were made to Pennsylvania law governing the operation of funeral homes, including a limitation that licensees practice at one principal place and no more than one branch of the business and a restriction subject to limited exceptions that funeral establishments be owned by licensed funeral directors.  *Id.* at 71–79.  The Third Circuit concluded that the practice limitation applied to Pennsylvania and out-of-state funeral directors to the same extent and that the "dormant Commerce Clause inquiry only considers whether the impact of the limitation falls equally upon instate and out-of-state funeral directors …."  *Id.* at 72.  Pennsylvania owners who wished to achieve economy of scale by sharing employees and equipment across multiple locations faced the same barriers as out-of-state owners.  *Id.*  Further, any individual or entity was able to obtain a license to operate a Pennsylvania funeral home provided they met certain requirements—none of which were Pennsylvania residency or citizenship.  *Id.* at 74.

Similarly, there is no allegation that Section 45:1–62(b) or any other law related to licensure in New Jersey burden Drs. MacDonald or Gardner's ability to obtain licensure.  Their argument is rather that they face the potential time, expense, and compliance burdens of obtaining and maintaining licensure in any state in which they may practice and that they have no need for a New Jersey license when they do not plan to provide their definition of treatment in New Jersey.  It may well be the case that many of the physicians who hold a New Jersey license also reside in New Jersey, however, "[s]o long as a State's regulation operates evenhandedly as to both in-state and out-of-state actors seeking to enter such an industry, we do not subject it to heightened scrutiny

under dormant Commerce Clause analysis." *Id.* at 72 (noting that the majority applicants for Pennsylvania funeral-directing licenses would also reside in Pennsylvania).

In *Tolchin v. Supreme Court of the State of New Jersey*, the plaintiff challenged requirements that New Jersey attorneys maintain a bona fide office within the state and attend in-person educational courses. 111 F.3d 1099, 1102–05 (3d Cir. 1997). Discussing the office requirement, the Third Circuit concluded that it was reasonable to assume that the only attorneys burdened by the requirement were those who wished to maintain only small or sporadic practices in New Jersey. *Id.* at 1107. The plaintiff argued that an attorney wishing to maintain a small or sporadic practice in New Jersey was forced to spend money to maintain an office when they would not receive the comparable benefits of an attorney with a larger New Jersey practice. *Id.* The Third Circuit did not disagree, but noted that the argument failed to implicate the Commerce Clause because such attorneys could be New Jersey residents or nonresidents. *Id.*

Drs. MacDonald and Gardner make similar arguments in no uncertain terms. "[D]uplicative fees, time, and ongoing compliance—do not similarly affect New Jersey physicians who need only one license to treat and speak with New Jersey patients," they claim. (Pls.' Opp'n Br. p.14.) Like in *Tolchin*, plaintiffs may be correct, but that New Jersey physician may or may not be a New Jersey resident. A national specialist residing in New Jersey but licensed in Pennsylvania faces the same hurdles as Dr. Gardner if they wish to engage in telemedicine with a patient in New Jersey. Therefore, it is Drs. MacDonald and Gardner's desire to engage with potential patients in New Jersey and maintain relationships with existing patients in New Jersey that create the asserted burdens. (*See id.* p.14 n.3 ("[T]he very nature of their national specialty practices requires that they may have the occasion to confer with a

New Jersey patient.").)   That does not equate to discrimination against out-of-state residents.   *See Tolchin*, 111 F.3d at 1108 ("Any incidental discrimination caused by the bona fide office requirement is not based on residency status, but on the size and type of an attorney's practice.").   Because I find that Section 45:1–62(b) in both purpose and effect treats in-state and out-of-state physicians seeking to practice telemedicine in New Jersey the same, I will apply *Pike*.   *See Mech. Contractors Ass'n*, 541 F. Supp. 3d at 495.

### 2.   *Pike* Standard

To repeat, the inquiry under *Pike* is whether Section 45:1–62(b)'s burdens on interstate commerce substantially outweigh its putative local benefits.   *See Heffner*, 745 F.3d at 71.   In applying *Pike*, plaintiffs repeat the same distinction regarding their definition of treatment rejected above and claim that defendant's asserted local benefit is that "preventing specialized national experts from practicing telemedicine protects society."   (Pls.' Opp'n Br. p. 17.) Of course, the cited pages to defendant's moving brief state no such thing despite plaintiffs' attempt at hyperbole.   Instead, defendant asserts that Section 45:1–62(b) operates in the same manner as New Jersey's in-person licensure requirement and New Jersey possesses an interest in ensuring that medical professionals are qualified.   (Def.'s Mot. Br. pp. 25, 26; *see also* Def.'s Reply Br. p. 11 (rebutting plaintiffs' characterization of the benefit asserted).) "'New Jersey has a heavy and traditional interest in regulating the practice of medicine within its borders,' and … such regulation is an important element of the state's police power."   *Getson v. New Jersey*, 352 F. App'x 749, 753 (3d Cir. 2009) (quoting *Zahl v. Harper*, 282 F.3d 204, 209–11 (3d Cir. 2002)).

With the correct local benefit asserted, the arithmetic shifts in favor of defendant.   The Third Circuit has noted that virtually all state regulations increase the cost of doing business.   *See Heffner*, 745 F.3d at 76.   The question is whether such burdens are excessive.   *Id.*   In *Heffner*, the court concluded

14

that the licensure requirements did not impose an excessive burden and that the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978)).

Similarly, the plaintiffs in *National Association for the Advancement of Multijurisdiction Practice v. Castille* challenged a reciprocity rule for admittance into the Pennsylvania bar. 799 F.3d 216, 218 (3d Cir. 2015). The Third Circuit found that any incidental effect on interstate commerce caused by declining to admit attorneys from non-reciprocal states by motion were not clearly excessive in light of Pennsylvania's interest in regulating its bar and assuring favorable treatment for its barred attorneys. *Id.* at 225. Any incidental effect was further mitigated by alternative means of admission, namely taking the Pennsylvania bar exam. *Id.*

A similar recourse is available to Drs. MacDonald and Gardner and specialists like them by obtaining New Jersey licensure. Much of their position boils down to a desire to establish new patients from New Jersey through consultation and maintain relationships with existing New Jersey patients through follow-ups without obtaining New Jersey licensure, which they believe is unnecessary and prohibitively expensive and time-consuming. Without doubting the importance of the care Drs. MacDonald and Gardner and other specialists provide, the burdens they claim are products of the size and nature of their practices, not their residency in Massachusetts, Pennsylvania, or any other state. The Commerce Clause does not protect a given plaintiff's preferred business practices. *See Mech. Contractors Ass'n*, 541 F. Supp. 3d at 495.

In light of New Jersey's strong interest in regulating the practice of medicine within the state, *see Getson*, 352 F. App'x at 753, I cannot conclude that the burdens associated with Section 45:1–62(b)'s requirement that those

seeking to practice telemedicine in New Jersey be licensed in New Jersey substantially outweigh the local benefit, *see Tolchin*, 111 F.3d at 1110 (concluding that the burdens of in-person education were small in relation to the local benefit of ensuring that attorneys were minimally familiar with New Jersey law); *see also SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1122 (9th Cir. 2022) (noting, in the context of teledentistry, the Dental Board of California's interest in regulating and investigating California dentists).

Plaintiffs' references to the potential reduction of available physicians for patients and pandemic-era relaxation of requirements do not change the calculus. The Third Circuit in *Tolchin* expressly recognized that New Jersey's office requirement burdened interstate commerce in that it reduced consumer options, but that the burden nevertheless did not "*clearly*" outweigh the benefit. 111 F.3d at 1109. The requirement was not the most narrowly tailored solution, but rather "rationally related to the benefit it [was] supposed to ensure." *Id.* Similarly, the court in *Mechanical Contractors Association* ultimately rejected the plaintiffs' argument that there was no evidence before the legislature that adding an ownership requirement to the definition of "licensed Master" protected the public health, safety, or welfare in ways that the prior licensing requirement did not. 541 F. Supp. 3d at 482, 496. That New Jersey temporarily relaxed certain requirements to address the exigencies of the pandemic is of no moment here. "[W]here heightened scrutiny is not warranted, [courts] must not 'second guess the empirical judgment of lawmakers concerning the utility of legislation.'" *Tolchin*, 111 F.3d at 1110–11 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)). Defendant's motion will be granted as to plaintiffs' dormant Commerce Clause claim.

**B.**    **Count 2 – Privileges and Immunities Clause**

Under the Privileges and Immunities Clause "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. art. IV, §2.   "[T]he pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause."  *United Bldg. and Const. Trades Council of Camden Cnty. and Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 219 (1984); *see also Ramos v. P.R. Med. Examining Bd.*, 491 F. Supp. 2d 238, 243 (D.P.R. 2007) ("The practice of medicine, as is the practice of law, is an economic and fundamental right protected by the Privileges and Immunities Clause.")  Thus, in evaluating plaintiffs' Privileges and Immunities Clause claim, I must determine 1) whether Section 45:1–62(b) discriminates against nonresidents and 2) if it does, whether its imposition is too heavy a burden on the privileges of nonresidents and it bears a substantial relationship to the state's objective.  *See Castille*, 799 F.3d at 224.

Defendant asserts that plaintiffs' Privileges and Immunities Clause claim falters out of the gate because there is no facial or effective discrimination against nonresidents.   (Def.'s Mot. Br. pp. 29, 30.)   All practitioners, residents and nonresidents alike, must be licensed to engage in telemedicine.   (Def.'s Mot. Br. p. 30.)   This requirement serves the non-protectionist aim of ensuring the health and safety of New Jerseyans.   (*Id.* pp. 31, 32.)   Even if Section 45:1–62(b)'s licensure requirement was discriminatory and protectionist, states must be given leeway in assessing and addressing local issues.   (*Id.* p. 32.)   Health and safety are historically matters of local concern within states' police powers.  (*Id.* pp. 32, 33.)   There is no disproportionate burden on nonresidents and the licensure requirement is substantially related to the state's interest in regulating the practice of medicine by ensuring that practitioners possess requisite qualifications.   (*Id.* pp. 33, 34.)

Plaintiffs argue that the licensure requirement discriminates against nonresidents in effect and that it therefore violates the Privileges and Immunities Clause unless it is supported by a substantial reason for difference in treatment and the discrimination bears a substantial relationship with the state's objective. (Pls.' Opp'n Br. p. 22.) Defendant's vague, non-protectionist aim concerning health and safety does not apply to plaintiffs' narrow, as-applied challenge and Section 45:1–62(b) places a disproportionately heavy burden on nonresidents. (*Id.* p. 23.) These burdens do not apply to New Jersey physicians, are prohibitive to specialists like Drs. MacDonald and Gardner who do not treat patients in New Jersey and reside far away, and less-restrictive alternatives exist as evidenced by pandemic-era practices. (*Id.* p. 24.)

Plaintiffs' arguments here suffer from similar flaws as their dormant Commerce Clause claim. Section 45:1–62(b) does not apply to a physician's state of residency, but rather their state of licensure and—importantly—treats New Jersey residents no differently than residents of other states. *See Castille*, 799 F.3d at 225 ("Rule 204 does not contravene Article IV's Privileges and Immunities Clause because it treats Pennsylvania residents no differently than out-of-state residents."). Similarly, in *Lawyers for Fair Reciprocal Admission v. United States*, the court concluded that the plaintiff failed to plead a Privileges and Immunities Clause claim even if such a claim could be asserted against the federal government, which it concluded that it could not. Case No. 22–02399, 2023 WL 145530, at *9 (D.N.J. Jan. 10, 2023), *cert. denied*, 144 S. Ct. 389 (2023). This was because the challenged local rule was based on the state in which an attorney was admitted to practice, not their state of residency. *Id.*

The same is true here. To borrow an example from above, a national specialist residing in New Jersey but licensed in Pennsylvania is in the same position as Dr. Gardner if they wish to practice telemedicine in New Jersey.

Plaintiffs claim that Section 45:1–62(b) places a disproportionately heavy burden on nonresidents, but—again—these burdens relate to the alleged prohibitive cost and effort to maintain licensure for Drs. MacDonald and Gardner.  These burdens more aptly relate to their states of licensure and the nature of their practices rather than their states of residency.  *See Castille*, 799 F.3d at 225 (distinguishing between state of residency and state of licensure).

Even if I were to conclude that Section 45:1–62(b) discriminates against nonresidents, I nonetheless find that the licensure requirement bears a substantial relationship to the state's objective and does not impose too heavy a burden on the privileges of nonresidents.  Far from a "vague" interest as plaintiffs refer to it, New Jersey has a strong interest in regulating the practice of medicine.  *See Getson*, 352 F. App'x at 753.  It is plain to me that requiring state licensure in order to practice telemedicine bears a substantial relationship to that interest and does not impose too heavy a burden on nonresidents who wish to practice in New Jersey.  *See Tolchin*, 111 F.3d at 1113 (noting that the challenge to New Jersey's mandatory-attendance requirement for continuing education was based on inconvenience as opposed to residency and was rational in light of the need to educate new attorneys).  Defendants' motion will be granted as to plaintiffs' Privileges and Immunities claim.

### C.    <u>Count 3 – First Amendment</u>

Some of the parties' most in-depth arguments pertain to plaintiffs' First Amendment claim.  Defendant, relying on *Castille*, characterizes Section 45:1–62(b) as a content-neutral professional licensing requirement subject to rational-basis scrutiny. (Def.'s Mot. Br. pp. 35, 36.) The licensure requirement does not turn on anything said between a patient and practitioner, but rather the qualifications of the practitioner.  (*Id.* p. 36.)  The fact that Section 45:1–62(b) is about licensure and does not restrict what a practitioner

may say means that post-*Castille* Supreme Court precedent does not apply, according to defendant.  (*Id.* pp. 37–39.)  Even if intermediate scrutiny is warranted, Section 45:1–62(b) clears that bar due to New Jersey's strong interest in regulating the practice of medicine.  (*Id.* p. 40.)  Discussing *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023), defendant emphasizes that it is New Jersey's prerogative to confirm that physicians obtain licensure by meeting educational, experiential, and testing requirements.  (*Id.* pp. 40–43.) *Brokamp* similarly supports rejecting plaintiffs' pandemic-era arguments, according to defendant.  (*Id.* pp. 43, 44.)

Plaintiffs allege that Section 45:1–62(b) regulates speech because they do not use telemedicine to treat patients, but rather discuss symptoms, diagnoses, and medical history with potential patients and check-in with current patients. (Pls.' Opp'n Br. pp. 24–26.)  The licensure requirement is content-based because it applies when a physician uses telemedicine to deliver healthcare services by speaking with a patient and not non-healthcare content.  (*Id.* pp. 26–28.)  It is therefore New Jersey's application of Section 45:1–62(b) that makes it content-based.  (*Id.* p. 28.)  Section 45:1–62(b) is also a speaker-based restriction because particular speakers (specialists not licensed in New Jersey) cannot speak to particular listeners (patients) about a restricted topic (specialized healthcare services).  (*Id.* pp. 28, 29.)

*Castille* does not control, according to plaintiffs, because they do not challenge the general licensure requirement, but rather the extent to which it applies to non-treatment conversations.  (*Id.* pp. 30, 31.)  The attorneys in *Castille* were unqualified, an issue that does not apply here because Drs. MacDonald and Gardner possess all necessary qualifications and the restriction here is speech rather than conduct.  (*Id.* p. 32.)  Dismissal would be inappropriate at this stage because in order to survive intermediate scrutiny, defendant must demonstrate that Section 45:1–62(b) advances an important

government interest unrelated to the suppression of speech and it does not burden substantially more speech than necessary. (*Id.* pp. 32, 33.) The factual record is not yet developed. (*Id.*) New Jersey has an important interest in regulating the practice of medicine, but this case is about telephone and video conversations concerning consultation and follow-ups. (*Id.* pp. 33, 34.) Plaintiffs add that the licensure requirement is not narrowly tailored, proposing alternatives including limiting Section 45:1–62(b) to video calls and verifying out-of-state physicians' license status and malpractice history. (*Id.* pp. 34–39.)

### 1. *Castille-Simandle*

Because the parties' arguments center in part on the applicability of *Castille*, I start there. *Castille*, as described above, involved a rule permitting admission into the Pennsylvania bar by motion so long as the attorney met several requirements, including passing the bar exam or practicing for a requisite number of years in a reciprocal state. 799 F.3d at 218. The parties disputed whether the rule was content-based and constituted a restriction on professional speech or restricted the time, place, and manner of speech. *Id.* at 220–21. The Third Circuit disagreed with both arguments. *Id.* at 221. Rather, the rule constituted an exercise of Pennsylvania's power to establish licensing standards and regulate the practice of law without dictating what a professional may or may not say. *Id.* Rational-basis review applied because the rule did not restrict professional speech but was a content-neutral licensure requirement. *Id.* And heightened scrutiny based on speaker discrimination did not apply because the rule did not turn on the content or viewpoint of any attorney's speech. *Id.* at 222–23.

*Castille* began a small line of bar-admittance cases. For instance, the object of the challenge in *National Association for the Advancement of Multijurisdiction Practice v. Simandle* was this District's local rule permitting

admission into the District's bar by motion for those admitted to the New Jersey State Bar while other attorneys were required to apply for *pro hac vice* admission in each case they wished to appear.   Case No. 14–03678, 2015 WL 13273313, at *1–2 (D.N.J. Sept. 1, 2015).   On a challenge that the local rule discriminated based on content or viewpoint, the court determined that only rational-basis review applied under *Castille* and granted the defendants' motion to dismiss.   *Id.* at *8–9, 12.   The rule did not discriminate based on a speaker's viewpoint, content, or identity, but rather served a significant interest in regulating membership of the District's bar.   *Id.* at *8–9.   It was also narrowly tailored because it left attorneys not admitted by the New Jersey Supreme Court with alternatives such as applying to the New Jersey bar or seeking admission *pro hac vice.*   *Id.* at *9.

The Third Circuit affirmed, concluding that—like in *Castille*—the local rule did not target any speech based on content or viewpoint.   *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Simandle*, 658 F. App'x 127, 136, 139 (3d Cir. 2016).   The rule placed minimal limitations on expressive activities and unlicensed attorneys were free to represent themselves *pro se*, pass the New Jersey bar exam, or apply for *pro hac vice* admission.   *Id.* at 136. The free-speech argument asserted, if adopted, would have "greatly undermine[d] the power of states to regulate bar membership, when this power has been repeatedly recognized and upheld by the courts."   *Id.* (quoting *Russell v. Hug*, 275 F.3d 812, 822 (9th Cir. 2002)).

By simply substituting a state's interest in regulating the practice of law with its interest in regulating the practice of medicine, the rule of *Castille* and *Simandle* becomes readily applicable to plaintiffs.   Section 45:1–62(b) does not dictate what a physician can and cannot say, but rather sets forth a requirement that those practicing telemedicine within New Jersey be licensed in New Jersey.   Whatever limit Section 45:1–62(b) places on the expression of

out-of-state physicians, no speech is targeted based on its content or the speaker's viewpoint.   And Drs. MacDonald and Gardner can become licensed in New Jersey, something they simply do not want to do.   *See id.* ("Unlicensed attorneys are free to represent themselves *pro se*, pass the New Jersey bar exam, or apply for admission *pro hac vice* on a case-by-case basis.").

Plaintiffs try to avoid *Castille* by arguing, as they do throughout their briefing, that the conversations in which they hope to engage are not treatment. This repeated moving of the goalpost is unhelpful and it makes little sense to base my decision on what Drs. MacDonald and Gardner define as treatment as opposed to the statute itself.   *See, e.g.*, N.J. Stat. Ann. § 45:1–61 (including "provider consultation" in the definition of "Telehealth").   Plaintiffs' attempt at a narrow, as-applied challenge appears in actuality to be an effort to rewrite the statute to better suit their practices and arguments.

## 2.   <u>Recent Decisions</u>

Plaintiffs have also twice cited supplemental authority after the close of briefing, once to bring to the Court's attention the Fifth Circuit's decision in *Hines v. Pardue*, 117 F.4th 769 (5th Cir. 2024) and more recently to reference the Third Circuit's decision *in Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025).   (ECF No. 30 (Pls.' Sept. 27, 2024 Notice), Pls.' Apr. 8, 2025 Notice.)   Defendant contends that neither case supplants *Castille* as the controlling decision.   (ECF No. 31, ECF No. 33.)

*Hines* involved a Texas-licensed veterinarian who started a website whereby readers provided photographs and medical records of their pets and the plaintiff responded to related questions by email.   117 F.4th 769, 772 (5th Cir. 2024).   Texas law required the creation of a veterinarian-patient relationship—which could only be formed by a physical examination or visit to where the animal was kept—before such advice could be offered.   *Id.*   The Fifth Circuit concluded that the requirement regulated speech, not just conduct,

because the plaintiff was penalized for his communication.    *Id.* at 777–78. The regulation only took effect when he shared his opinion with the pet's owner. *Id.* at 778.   It further assumed without deciding that the regulation on speech was content-neutral and that it could not survive intermediate scrutiny.    *Id.* at 779–85.

Plaintiffs attempt to draw parallels between this case and *Hines* as Section 45:1–62(b) is purportedly triggered by the use of telemedicine to discuss symptoms, medical history, and the like.   (Pls.' Sept. 27, 2024 Notice pp. 3, 4.) *Hines* further cautions against dismissal at the pleading stage because—even if intermediate scrutiny applies—New Jersey's burden is heavy and plaintiffs have presented several less-restrictive alternatives.   (*Id.* p. 4.)

However, whatever value *Hines* may have, it is too distinct to be persuasive.   Notably, the *Hines* plaintiff's general mode of speech—emails—do not constitute telemedicine in New Jersey.   *See* N.J. Stat. Ann. § 45:1–61 ("'Telemedicine' does not include the use, in isolation, of electronic mail, instant messaging, phone text, or facsimile transmission.").   More importantly, *Hines* says nothing about licensure requirements, likely because the plaintiff was licensed to practice in Texas.   For *Hines* to be apt, Drs. MacDonald and Gardner would had to have obtained New Jersey licensure only for new constraints to be placed on their ability to practice telemedicine.

*Veterans Guardian* concerned the consultation industry formed to assist veterans with disability claims.   133 F.4th at 217.   New Jersey law prohibited compensation for advising or assisting in the preparation, presentation, or prosecution of a benefits claim except as allowed by federal law and compensation for any services rendered prior to the veteran's appeal of the initial Department of Veterans Affairs decision.   *Id.* at 218.   The Third Circuit vacated the district court's denial of the plaintiffs' motion for a preliminary injunction, deciding that the plaintiffs were likely to succeed on the merits

because the professional services provided were delivered by speaking and writing and were thus likely speech. *Id.* at 219. New Jersey's ban on charging for that speech naturally burdened it. *Id.* at 219–20. Post-*National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018), professional speech could not be differentiated from any other speech absent limited exceptions. *Id.* at 220. New Jersey attempted to fit into one of those exceptions by arguing that its law regulated price rather than speech, regulated speech incidental to illegal conduct, and constituted a content-neutral professional licensure scheme. *Id.* The court rejected the first two arguments and concluded that the district court was to consider the licensure argument on remand. *Id.* at 220–21.

Plaintiffs rely on *Veterans Guardian* for the proposition that Section 45:1–62(b) regulates speech because it is triggered by the use of telemedicine to provide and receive medical advice. (Pls.' Apr. 8, 2025 Notice p. 4.) However, once again, plaintiffs refer me to a case that does not rebut *Castille* because it provides no insight into licensure requirements. The Third Circuit expressly did not reach the licensure issue. *Veterans Guardian*, 133 F.4th at 221.

It is true that, as noted in *Veterans Guardian*, *Becerra* clarified that professional speech is not distinct from other forms of speech. *See* 585 U.S. at 767 ("[T]his Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'"). However, that has no bearing on the licensure requirement at issue here. Returning to the *Castille-Simandle* line of cases, a court within this District[5] recently considered another challenge to the local rule pertaining

---

[5] District Judge Gerald A. McHugh Jr. wrote the underlying decisions in *Lawyers for Fair Reciprocal Admission*, *Simandle*, and *Castille*, the first two decided in this District and the latter decided in the Eastern District of Pennsylvania. Judge McHugh sits in the Eastern District of Pennsylvania. *See* Gerald A. McHugh, United States District Court – Eastern District of Pennsylvania, https://www.paed.uscourts.gov/judges-info/district-court-judges/gerald-mchugh. A review of the two

to admission to the District bar. *See Laws. for Fair Reciprocal Admission*, 2023 WL 145530, at *1–2. The court noted that the Third Circuit in *Castille* and *Simandle* partly relied upon the notion of "professional speech," but concluded that *Becerra* did not necessitate a new result in the face of a similar challenge. *Id.* at *6. Referring to its district-level decision in *Simandle*, the court stated that it "did not rely on a lesser scrutiny for professional speech" but rather had concluded that the local rule "did not discriminate on the basis of the content of any attorney's speech." *Id.* *Becerra* therefore did not lead to a result different than *Simandle*. *Id.*; *see also Simandle*, 2015 WL 13273313, at *9 (finding that the District's local rule did not "prohibit a category of professional speech"). The local rule also did not constitute viewpoint or speaker discrimination because it did not discriminate on the basis of the viewpoint or identity of the speaker. *Laws. for Fair Reciprocal Admission*, 2023 WL 145530, at *6.

The same result is warranted here. Section 45:1–62(b) does not inquire as to the identity of a physician or what they might say, but rather is interested in whether they are licensed in New Jersey. As such, I am persuaded that it is a content-neutral licensure scheme and that it is valid so long as it has a rational connection to a physician's fitness or capacity to practice. *See Castille*, 799 F.3d at 221. Section 45:1–62(b) meets that standard.

Section 45:1–62(b) furthers New Jersey's strong interest in regulating the practice of medicine. *See Simandle*, 2015 WL 13273313, at *9 (finding that the District's local rule served a significant interest in regulating bar membership and was sufficiently tailored by leaving attorneys free to seek admission through other means); *see also Getson*, 352 F. App'x at 753 (recognizing New Jersey's interest in regulating the practice of medicine). Requiring licensure

---

District of New Jersey dockets indicates that Judge McHugh was designated to this District for those cases pursuant to 28 U.S.C. §292(b).

in New Jersey is logically related to a physician's qualifications.  *See In re Kim*, 958 A.2d 485, 490 (N.J. Super. Ct. App. Div. 2008) (noting the Board's dual purpose of granting licensure to qualified physicians and protecting New Jersey citizens).  It follows then that requiring New Jersey licensure to practice telemedicine is rationally related to a physician's fitness and capacity to practice.  Adopting plaintiffs' construction of the First Amendment would provide a workaround to state licensure and undermine New Jersey's interest in regulating the practice of medicine in the process.  *See Simandle*, 658 F. App'x at 136 (raising similar concerns regarding the regulation of bar membership).

Plaintiffs' effort to distinguish *Castille* because the attorneys there "were denied licensure due to lacking the necessary qualifications," (Pls.' Opp'n Br. p.32), is unpersuasive.  The plaintiffs in *Castille* satisfied the bar requirements of other jurisdictions but sought to practice by reciprocal admission in Pennsylvania.  799 F.3d at 218.  Arguing that a professional licensed to practice in one state may "lack[] the necessary qualifications" to practice in another is absolutely on point for the instant discussion, but not in a way that plaintiffs may intend.   Furthermore, I do not agree with plaintiffs that dismissal is premature.  Applying *Castille*, it is clear to me from the pleadings that Section 45:1–62(b) is rationally connected to physicians' fitness and capacity to practice and development of the factual record is unnecessary. *See Laws. for Fair Reciprocal Admission*, 2023 WL 145530, at *6–7 (dismissing the plaintiff's First Amendment claims); *Simandle*, 2015 WL 13273313, at *7–10 (same).   Plaintiffs' First Amendment claim will be dismissed.

### D.    Count 4 – Substantive Due Process

Lastly, I turn to Abell's due process challenge.  Parents possess a fundamental due process right to make decisions concerning the care, custody, and control of their children.  *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*,

650 F.3d 915, 933 (3d Cir. 2011).   This right is not absolute.   *Id.* (discussing such limits in the context of school policies).

Defendant does not dispute this general right but notes only—citing *Sammon v. New Jersey Board of Medical Examiners*, 66 F.3d 639 (3d Cir. 1995) and *Doe ex rel. Doe v. Governor of New Jersey*, 783 F.3d 150 (3d Cir. 2015)—that this right does not extend to a parent's choice of treatment or provider.   (Def.'s Mot. Br. pp. 44, 45.)   Because the licensure requirement does not implicate a fundamental right, rational-basis review applies and is met.   (*Id.* p. 46.)

Plaintiffs respond that Section 45:1–62(b) restricts Abell's ability to seek medical care for his child, prohibiting him from discussing concerns with Dr. MacDonald and forcing him to travel to Massachusetts to meet with Dr. MacDonald in-person, which he would prefer not to do absent serious circumstances.   (Pls.' Opp'n Br. pp. 39, 40.)   Section 45:1–62(b) leaves children worse off by limiting parents' ability to consult with specialists.   (*Id.* p. 40.) Plaintiffs claim that defendant cites *Sammon* and *Doe* to avoid strict scrutiny and that is a merits argument inappropriate for this stage.   (*Id.* p. 42.)   In any case, *Sammon* and *Doe* are inapplicable, according to plaintiffs.   (*Id.* pp. 42–45.)   Unlike *Sammon*, for instance, the allegation here is that there is an absence of specialists in New Jersey and thus Abell's choice is not between Dr. MacDonald and a New Jersey specialist, but rather Dr. MacDonald and inadequate care.   (*Id.* p. 43.)   Abell wishes only to access expert advice as opposed to treatment and does not seek to force New Jersey to make available any type of treatment.   (*Id.* pp. 44, 45.)   Finally, even if rational basis applies, plaintiffs assert that they are entitled to prove that the state's interest in health and safety is not furthered here.   (*Id.* p. 45.)

For the final time in this opinion, I will reject plaintiffs' attempt to insert their definition of treatment as opposed to what is set forth in the statute. From there, it appears to me that *Sammon* is directly on point and controls my

analysis.    The plaintiffs in *Sammon* challenged New Jersey's licensure statute regulating the practice of midwifery.    66 F.3d at 641.    In determining the applicable standard of review, the Third Circuit noted that parents' interest in selecting the midwife of their choice was not fundamental and thus subject to rational-basis review.    *Id.* at 644–45.    Weighing the state's interest in protecting the health and welfare of mother and child, the court concluded that it was for the legislature rather than courts to balance the advantages and disadvantages of various requirements and that it could not find such requirements to be irrational.    *Id.* at 646–47.

Because "parents have no constitutional right to their choice of a health care provider who does not meet quality control standards that a legislator might reasonably conceive to be desirable," rational-basis review applies on the face of the complaint.    *See id.* at 647; *see also Doe v. Christie*, 33 F. Supp. 3d 518, 529 (D.N.J. 2014) ("[T]he fundamental rights of parents do not include the right to choose a specific type of provider for a specific medical or mental health treatment that the state has reasonably deemed harmful." (quoting *Pickup v. Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014))).    Plaintiffs cite no authority contradicting this established principle, they only endeavor to distinguish the cases cited by defendant and contextualize Section 45:1–62(b) with the real-world consequences its application may have in practice.

I have no reason to doubt plaintiffs' contextual arguments, but only note that they are not for me to weigh.    Applying rational basis, I look to the state's asserted legitimate interest—the health and safety of the public—and determine whether the legislature could have rationally concluded that requiring New Jersey licensure in order to practice telemedicine in New Jersey served that interest.    *See Heffner*, 745 F.3d at 79.    I conclude that it could have.    "[A] court engaging in rational basis review is not entitled to second guess the legislature on the factual assumptions or policy considerations

underlying the statute." *Sammon*, 66 F.3d at 645.  Abell's due-process challenge will therefore be dismissed.

## IV.  CONCLUSION

Plaintiffs' complaint and opposition raise a litany of concerns informed by their experiences providing, seeking, and obtaining specialized medical care. These concerns thoughtfully highlight the practical effects of Section 45:1–62(b).  Ultimately, I conclude that plaintiffs' arguments—including and especially their claims that telemedicine as they provide and receive it does not constitute "treatment"—raise questions of policy that are suited for the legislature, not me.  *See Castille*, 799 F.3d at 221–22 (acknowledging the plaintiffs' "intriguing arguments" regarding the bar exam but concluding that "it is not our role to 'judge the wisdom, fairness, or logic of legislative choices'") (quoting *Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009))).  The question before me is whether plaintiffs have plausibly pleaded the constitutional violations alleged.   I conclude that they have not.

In light of the importance of the interests asserted and because I cannot say here that amendment would be futile or inequitable, dismissal will be without prejudice.  *See Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 217 (3d Cir. 2013).  Plaintiffs will be provided 14 days to indicate whether they intend to file an amended complaint.  Any amendment shall comply with the requirements of Local Civil Rule 15.1.

For the foregoing reasons, defendant's motion (ECF No. 23) will be GRANTED.   An appropriate order accompanies this opinion.

  /s/ Edward S. Kiel  
EDWARD S. KIEL  
UNITED STATES DISTRICT JUDGE

Dated:  May 12, 2025